925 A.2d 659

**ARCHDIOCESE OF WASHINGTON, et al.**

v.

**William T. MOERSEN.**

**No. 69 Sept. Term, 2005.**

Court of Appeals of Maryland.

June 14, 2007.

638

Emmet T. Flood (Lisa M. Duggan and Jeb Boatman of Williams & Connolly, LLP, Washington, DC), on brief, for Petitioners.

L. Jaenette Rice (Walsh, Becker, Spears & Moody, Bowie, MD), on brief, for Respondent.

ARGUED BEFORE BELL, C.J., RAKER, WILNER *, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BELL, Chief Judge.

The central issue in this case involves whether an organist for a Catholic church falls within the Title VII "ministerial exception," a legal exception carved out in deference to the Free Exercise Clause of the First Amendment that precludes government interference, or judicial involvement, in the employment decisions of religious organizations. We shall hold that, under the facts of this case, an organist holding a position similar to that occupied by the respondent does not

---

* Wilner, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

come within the ministerial exception. Thus, he may prosecute a Title VII claim.

### A.

■ The First Amendment, as relevant, provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const., Am. I. These religious prohibitions are applied to the states through the Fourteenth Amendment. *Employment Div., Ore. Dept. of Human Res. v. Smith,* 494 U.S. 872, 876–77, 110 S.Ct. 1595, 1599, 108 L.Ed.2d 876, 884 (1990). *See also Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213, 1217–18 (1940); *Levitsky v. Levitsky,* 231 Md. 388, 396–97, 190 A.2d 621, 625 (1963); *Craig v. State,* 220 Md. 590, 599, 155 A.2d 684, 690 (1959). The free exercise clause prohibits government regulation of religious beliefs. *Wisconsin v. Yoder,* 406 U.S. 205, 219, 92 S.Ct. 1526, 1535, 32 L.Ed.2d 15, 27 (1972). Legitimate claims to free exercise, however, can be outweighed by government interests, albeit only those of the highest importance. *Yoder,* 406 U.S. at 214–15, 92 S.Ct. at 1532–33, 32 L.Ed.2d at 23–25.

The free exercise protection is also present in Article 36 of the Declaration of Rights of the Maryland Constitution. It provides, as relevant, that:

"... all persons are equally entitled to protection in their religious liberty; wherefore, no person ought by any law to be molested in his person or estate, on account of his religious persuasion, or profession, or for his religious practice, unless, under the color of religion, he shall disturb the good order, peace or safety of the State, or shall infringe the laws of morality, or injure others in their natural, civil or religious rights; nor ought any person to be compelled to frequent, or maintain, or contribute, unless on contract, to maintain, any place of worship, or any ministry ..."

■ The Free Exercise Clause, as embodied in the U.S. Constitution and Article 36 of the Maryland Declaration of Rights, does not provide "a constitutional right to ignore

neutral laws of general applicability," even when such laws have, as an incidental effect, the burdening of a particular religious activity, however. *City of Boerne v. Flores*, 521 U.S. 507, 513, 117 S.Ct. 2157, 2161, 138 L.Ed.2d 624, 634 (1997). *See also Church of the Lukumi Babalu Aye v. Hialeah*, 508 U.S. 520, 531, 113 S.Ct. 2217, 2226, 124 L.Ed.2d 472, 489 (1993); *Employment Div., Ore. Dept. of Human Res.*, 494 U.S. at 892, 110 S.Ct. at 1607, 108 L.Ed.2d at 894; *Levitsky*, 231 Md. at 396–397, 190 A.2d at 625; *Craig*, 220 Md. at 599, 155 A.2d at 689.

■ Under the Free Exercise Clause, strict scrutiny is used to evaluate whether laws target religious practices or impose burdens, motivated by religious belief, on conduct. *Church of the Lukumi Babalu Aye*, 508 U.S. at 531–32, 113 S.Ct. at 2226, 124 L.Ed.2d at 489. Moreover, the Supreme Court has noted that:

> "[A] spirit of freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine. Freedom to select the clergy, where no improper methods of choice are proven, we think, must now be said to have federal constitutional protection as a part of the free exercise of religion against state interference."

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94, 116, 73 S.Ct. 143, 154–155, 97 L.Ed. 120, 136–137 (1952).

The Supreme Court has made clear that the church can self-govern beyond the reach of judicial power. *See, e.g., N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490, 504, 99 S.Ct. 1313, 1320, 59 L.Ed.2d 533, 543 (1979) (holding that, because of a potential conflict with the First Amendment, the National Labor Relations Act did not apply to teachers in church-operated schools). Federal courts have reinforced that message. *See, e.g., Gellington v. Christian Methodist Episcopal Church*, 203 F.3d 1299, 1304 (11th Cir.2000) (holding that, in matters of church governance and administration, the govern-

ment shall not interfere); *Bollard v. California Province of Society of Jesus,* 196 F.3d 940, 945 (9th Cir.1999) (holding that the "Free Exercise Clause restricts the government's ability to intrude into ecclesiastical matters or to interfere with a church's governance of its own affairs"); *Combs v. Central Texas Annual Conference United Methodist Church,* 173 F.3d 343, 348 (5th Cir.1999) (noting that the Free Exercise Clause protects a church from government interference with church management); *E.E.O.C. v. Catholic University of America,* 83 F.3d 455, 463 (D.C.Cir.1996) (holding that the Free Exercise Clause "guarantees a church's freedom to decide how it will govern itself").

Employment decisions typically are governed by Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e *et seq.* (1964). That Title makes unlawful any employment practice that discriminates on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–1 (a) carves out a statutory exception, however. That exception is for:

> "... an employer with respect to the employment of aliens outside any State, or *to a religious corporation, association, educational institution, or society* with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities."

(Emphasis added). This "exception" for religious organizations also is embodied in 42 U.S.C. § 2000e–2 (e), which provides:

> "(2) it *shall not be an unlawful employment practice* for a school, college, university, or other educational institution or institution of learning to hire and employ employees of a particular religion if such school, college, university, or other educational institution or institution of learning is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or *by a particular religious corporation, association, or society,* or if the curriculum of such school, college, university, or other edu-

cational institution or institution of learning is directed toward the propagation of a particular religion." (Emphasis added).

The exception for religious organizations and their employment relationships with persons performing religious duties was considered by the Supreme Court in *Corporation of Presiding Bishop v. Amos*, 483 U.S. 327, 336, 107 S.Ct. 2862, 2868, 97 L.Ed.2d 273, 283 (1987). Supporting the exception, it explained:

> "[I]t is a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious. The line is hardly a bright one, and an organization might understandably be concerned that a judge would not understand its religious tenets and sense of mission. Fear of potential liability might affect the way an organization carried out what it understood to be its religious mission."

*See also Gellington*, 203 F.3d at 1303–1304 (holding that government interference with clergy employment matters violates the Free Exercise Clause); *Combs*, 173 F.3d at 350 (holding that the judiciary could not rule on an *employment* decision concerning a minister without violating the Free Exercise Clause).

This Court, in addition to recognizing the Title VII exception insulating religious organizations from sanction for discrimination when making employment decisions, based on religious beliefs, even with respect to the protected classes of race, color, sex, and national origin, the other protected classes, has recognized that under Title VII, "the Free Exercise Clause of the First Amendment precludes the application of these Title VII provisions to employment decisions by religious organizations concerning ministers, teachers, and other employees whose duties are 'integral to the spiritual and pastoral mission' of the religious organization." *Montrose Christian School Corporation v. Walsh*, 363 Md. 565, 590, 770 A.2d 111, 126 (2001), *quoting E.E.O.C. v. Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 795, 797 (4th Cir.2000).

Other courts have done so as well. *See Little v. Wuerl,* 929 F.2d 944, 951 (3rd Cir.1991) (holding that a parochial school teacher could not, because of the exception, file a Title VII claim even though she w as discharged because she remarried); *Scharon v. St. Luke's Episcopal Presbyterian Hospitals,* 929 F.2d 360, 363 (8th Cir.1991) (holding that, in a gender discrimination action, a chaplain at a church hospital could not file a Title VII claim). In other words, engrafting a ministerial exception onto the Title VII protected classes allows the church significant latitude in its employment decisions when the employee in question has duties that are integral to the religious mission.

■ The "ministerial exception to Title VII," as it is known, applies to any employee whose "primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship." *Rayburn v. General Conf. of Seventh–Day Adventists,* 772 F.2d 1164, 1169 (4th Cir.1985). *See also McClure v. Salvation Army,* 460 F.2d 553 (5th Cir.1972) (a sex discrimination case, in which the Court found that the role of a Salvation Army officer fit within the scope of the "ministerial exception"). More specifically, *Rayburn,* 772 F.2d at 1168, established what has become known as the "primary duties" test. Pursuant to that test, the ministerial exception "does not depend upon ordination but upon the function of the position." 772 F.2d at 1168

This Court recognized this exception in *Montrose.* There, we interpreted a Montgomery County statute that provided, "it shall not be an unlawful employment practice * * * [f]or a religious corporation, association, or society to hire and employ employees of a particular religion," holding that it was not violative of the Free Exercise Clause of the First Amendment nor of Article 36 of the Maryland Declaration of Rights. 363 Md. at 584, 770 A.2d at 122.[1]

With this context in mind, we turn to the case at hand.

---

1. In *Montrose Christian School Corporation v. Walsh,* 363 Md. 565, 770 A.2d 111 (2001), a consolidated case, two school employees brought an

## B.

The respondent, William Moersen ("Moersen"), was employed as an organist at St. Catherine Labouré Parish ("the Parish") from 1958 to 1976[2] and again from 1991 to 2002. During these periods, he did not have a written employment contract. On July 11, 2001, Moersen and Robert G. Amey, the Pastor of the Parish, entered into an employment contract for Moersen's services as "Organist/Pianist/Keyboard Accompanist." Being for a term of two years, from July 1, 2001 until June 30, 2003, the contract provided, with respect to the respondent's responsibilities:

"*Job objectives:*

"To Support the Gospel message through the music ministry of Saint Catherine Laboure Church and to encourage the congregation to assume as active part in their musical participation at all liturgical parish functions.

"*Job description:*

"To provide Organ/Piano/Keyboard Music and/or musical accompaniment to both the congregation and the choirs of Saint Catherine Laboure Church at the 10:30 a.m., 12:00 noon and 1:15 p.m. Sunday services; to provide the same at the weekly Saturday 5:15 p.m. service; to provide same at special liturgical celebrations as listed below; to provide musical accompaniment for the congregation at the 7:00 p.m. Monday night weekly novena service.

---

employment discrimination action against a private religious school and its principal. The employees claimed they had been terminated for not being of the religion represented by the school.

The case turned on whether a local ordinance, § 27–19 of the Montgomery County Code, which prohibited employers from discriminating against employees on the basis of religious creed, but carved out an exception for those employees performing religious functions, violated Article 36 of the Maryland Declaration of Rights. This Court held that it did not. 363 Md. at 596, 770 A.2d at 129.

We are not, under the facts of the case *sub judice,* asked to resolve the merits of *Montrose.*

**2.** Moersen originally began working at the Parish in 1958 as an organist, when he was eleven years old.

"2. *Responsibilities of the organist:*

"a. To build and sustain congregational song at all liturgies.

"b. To assist in selecting music associated with the worship at all liturgies in which he/she participates.

"c. To assist in planning the music associated with the above mentioned liturgies.

"d. To participate in special liturgical celebrations when requested, especially Christmas, Lenten and Easter liturgies, Confirmation, First Communion, and Reconciliation liturgies.

"e. To work under the very general supervision of the choir directors of the Liturgical Choir and the Hispanic Choir.

"f. To attend parish staff meetings when appropriate.

"3. *Related job requirements:*

"a. The organist reports to the director of the choir concerning music and also has, as needed, access to the pastor who is ultimately the person to whom the organist must answer to regarding job related issues.

"b. The organist shall be an ex officio member of all committees concerning liturgy.

"c. The organist will accept engagements to assist at weddings and funerals and when he is unable to accept such engagements he will recommend suitable substitutes if he is asked to do so. The fees for these services will be a matter between the organist and the party requesting his services.

"d. The organist will receive four (4) weeks of paid vacation each year."

For the performance of those duties, the respondent was to receive an annual salary of $26,500.00, in addition to other benefits, including hospitalization insurance. Also, "[b]y mutual agreement the parties to the contract may terminate the contract in writing with advance notice of 90 (ninety) calendar days."

In 2001, the respondent informed the pastor who was in charge of the Parish and employment decisions, that he had been sexually abused by a Parish choirmaster from 1958 to 1964.[3] Immediately after reporting the sexual abuse, the respondent alleged that his employment situation began to deteriorate, as the pastor began to find fault with the respondent's performance. Prior to 2001, the respondent's performance record had been exemplary; he had never received a negative performance evaluation or warning during the some twenty-nine (29) years of employment with the Parish.

In November 2001, Moersen was told that he should retire from his position with the Parish, and was offered up to $2,000.00 to seek psychiatric counseling. Thereafter, on February 17, 2002, the respondent's employment was terminated unilaterally and without advance notice, based on his "apparent inability to work cooperatively." The respondent brought an action alleging breach of contract, wrongful discharge, and intentional infliction of emotional distress against the Parish, its pastor, and the Archdiocese of Washington (collectively, "the petitioners,") in the Circuit Court for Prince George's County.

The Archdiocese moved to dismiss the respondent's complaint. It argued that the court lacked subject matter jurisdiction and, based on the religious guarantees of the U.S. and Maryland Constitutions, the complaint failed to state a claim. The Circuit Court denied the motion, so that the parties could engage in discovery, albeit limited, as to the nature of the organist position, a matter critical to determining whether the "ministerial exception" would apply.

---

3. These acts of sexual abuse, Moersen alleged, occurred at the Parish itself during church services, at church-sponsored functions, and at other locations. Beginning in 1958 and through 1964, he said that he communicated to at least four different priests that he was being abused. All of these priests praised him for his honesty and advised him to get himself out of the situation. The Parish, however, never took any action against the offender, he maintained.

In 2001, Moersen requested that the pastor relay his allegations of abuse to church superiors and the pastor assured the respondent that he would.

In answers to interrogatories and answers to requests for admissions, the respondent admitted that his contract enumerated several religious purposes. In those answers, he denied, however, discharging any of those duties and stated that he "did not encourage the congregation to assume an active part in their musical participation."

In moving for summary judgment, the Archdiocese argued that, under *Montrose,* the respondent's position was covered by the ministerial exception. It emphasized that the respondent's undisputed duty was to play music at religious services for the Catholic Church. The motion was granted, precipitating Moersen's appeal to the Court of Special Appeals.

In an unreported opinion, the Court of Special Appeals reversed the judgment of the Circuit Court. It held that the court erred in granting the petitioners' motion for summary judgment. We granted the petitioners' petition to this Court for a writ of certiorari. *Archdiocese v. Moersen,* 389 Md. 124, 883 A.2d 914 (2005).

## C.

 Central to determining whether the ministerial exception applies in the case *sub judice* is deciding what, in fact, Moersen's role was in the church, which, in turn, requires an assessment of his duties. Until 2001, the respondent worked without a written contract. Only in 2001 was the first written contract introduced into the employment relationship.

Although this contract enumerated, with some specificity, job objectives, the respondent maintains that he was not required to perform and had never been required to, and, in fact, did not, achieve or attempt to achieve all of them. As far as he was concerned, his only duties at the Parish were to provide at the 10:30 a.m., 12:00 noon, and 1:15 p.m. Sunday services instrumental music and/or musical accompaniment to both the congregation and the choirs of St. Catherine Laboure Church, to provide those services at the weekly Saturday 5:15 p.m. service, to provide musical accompaniment for the Tuesday and Friday evening weekly choir rehearsals, to provide

musical accompaniment at special services, when requested, and to provide musical accompaniment for the congregation at the 7:00 p.m. Monday night weekly novena service. Moersen contends that he did not plan, nor select, the music associated with the worship at any of the liturgies. That was done by either the Music Director or choir directors. In essence, the respondent claims that he was merely an organ player.

The respondent further contends that he supervised no one, and, in fact, never performed any duties in a leadership, teaching or training capacity. Nor was he required to attend staff or committee meetings. Consistently, the respondent was not listed as a staff member on the church directory of St. Catherine Laboure. As was true with the other religious groups for whom he performed as an organist or pianist, including Jews, Moslem and Hindu, he was not required to profess, support or become a member of the Catholic faith.

The petitioners viewed, and continue to do so, Moersen's role quite differently. They stress that Moersen's contract placed on him the responsibility to "(1) build[ ] and sustain[ ] congregational song at all liturgies, (2) assist[ ] in selecting and planning the music associated with liturgical worship, and (3) participat[e] in special liturgical celebrations." In addition, the petitioners note that the contract placed the respondent's duties in a "larger religious perspective," "[t]o support the Gospel message through the music ministry of Saint Catherine Laboure Church and to encourage the congregation to assume an active part in their musical participation at all liturgical parish functions."

The Court of Special Appeals' approach to the dispute in this case was to look at similar cases involving employees of a church whose duties involved providing music for the services and church events. From that analysis, the intermediate appellate court held that "[a]lthough music is generally an important part of the Catholic faith, here, [Moersen's] position fell outside the ambit of the ministerial exception." We agree.

The Court of Special Appeals primarily relied on *Assemany v. Archdiocese of Detroit,* 173 Mich.App. 752, 434 N.W.2d 233

(1988), whose facts were compared to the facts in the case *sub judice.* In *Assemany,* the appellant, a white male organist, had graduated from a school operated by the church to train organists and worked for several Catholic parishes in the Detroit area. 434 N.W.2d at 234. He was offered a position as the musical director for the a parish in the Archdiocese, and was given an "oral assurance of lifetime employment as long as he did his job properly." *Id.* The applicable contract prescribed his responsibilities:

"The music Director will be, in conjunction with the Parish Worship Committee, completely responsible for all liturgical music in the parish, and all music connected with paraliturgical services, such as bible vigils, vespers, penance services, etc."

434 N.W.2d at 234. In addition, it required the appellant to:

"select, prepare, and teach suitable and appropriate music to the congregation, prepare music fitting to the theme of each Sunday and holy day liturgy, provide music for the daily masses, select music for and direct the parish choir, aid in the musical participation of Gesu students in their liturgies, assist with and participate in liturgies or musical events on a vicariate level and provide music for weddings and funerals[, and ...] to be present fifteen minutes in advance of any liturgy or parish activity in which he was to participate."

434 N.W.2d at 234–35. The appellant subsequently[4] "assumed the duties of teaching the school children at [the parish] to participate in daily mass and conducting a children's choir ... he handled all of the musical functions for the parish liturgies." 434 N.W.2d at 235.

Toward the end of the appellant's second term as music director, the parish received a new pastor, and the appellant's relationship with the church began to deteriorate. *Id.* The new management criticized the appellant's abilities and the

---

4. The appellant entered into a second three-year contract after the initial term expired, again being retained as the musical director.

choices he made as musical director. *Id.* Although the appellant was re-signed to a one-year contract, that contract detailed areas that "needed improvement," and required him to take music lessons to improve his ability and to develop a program to prepare the children to sing at the Saturday and Sunday services. *Id.* Before the expiration of the contract term, the appellant was informed by the pastor that "[the parish] needed a younger and black organist," and that his contract would not be renewed. *Id.* From the expiration of his contract term to his dismissal, approximately a year later, the appellant's job description was:

> "Plaintiff was given the new title of pastoral musician. The contract incorporated a job description for that position. Plaintiff was relieved of his responsibilities to teach music to children in the Gesu school and to direct the children's choir. He was in charge of the liturgical music of the parish and its performance. In addition, plaintiff was to develop a cantor program at Gesu in accordance with the guidelines of the archdiocesan program for cantors."

434 N.W.2d at 235–36.

The parish, meanwhile, hired a younger white man to teach the parish students, direct the children's choir, and play the music for daily mass. When this man resigned later, the appellant unsuccessfully sought to resume those responsibilities. The parish hired a young black man instead. 434 N.W.2d at 236.

The appellant filed a discrimination claim against the parish. The trial court, however, granted summary judgment to the parish on the ground that, as a "nonsecular (religious)" employee, *id.*, his claims were barred by the Free Exercise Clause of the First Amendment. 434 N.W.2d at 234. The Supreme Court of Michigan affirmed. *Id.* The court rejected the appellant's argument that his role was merely secular because, although he was engaged in a religious activity, he was not promoting the church's faith or doctrine. 434 N.W.2d at 238. It explained:

"Plaintiff was required to have a working knowledge of the Catholic religion and liturgy. He was responsible for the selection and teaching of all liturgical music in the parish. His primary responsibility was to enable and encourage the Gesu choir and congregation to participate in the Catholic liturgy through song. Plaintiff assumed a pastoral-liturgical leadership role in the parish.

"On the basis of the facts of this case, we conclude that, while employed at Gesu, plaintiff was more than just an organist. He was the head of the musical branch of the Catholic liturgy there. Plaintiff was intimately involved in the propagation of Catholic doctrine and the observance and conduct of Catholic liturgy by the Gesu congregation. On the basis of 'the function of his position,' plaintiff was, thus, 'clergy' ... His Title VII discrimination claim is therefore barred by the free exercise clause of the First Amendment of the United States Constitution."

*Id.*

Contrasting *Assemany* and the case sub *judice,* the Court of Special Appeals opined:

"The difference between the case before us and *Assemany,* is that [Moersen] merely played the organ at various services, whereas in *Assemany,* the plaintiff assumed a far more significant role in religion and liturgy. As the *Assemany* Court stated, the 'plaintiff was more than just an organist.' [Moersen], in the case at hand, was 'just an organist.' Beyond playing the organ and occasionally selecting which songs to play, there was no evidence that [Moersen] participated in services beyond that of playing the organ or that he was part of the ministry to spread the Catholic religion. He was not, for example, a choir director; nor was his position similar to that of the organist in *Assemany.* Again, the meager evidence before us to support the decision of the circuit court is the language of the contract, not the nature of the duties [Moersen] actually performed.

\* \* \*

"Although [Moersen]'s duties were to 'support the Gospel message' through music and to 'encourage the congregation to assume an active part in their musical participation' at mass and other religious functions, there is no additional evidence that he did anything more than play the organ and occasionally sing during services. Aside from the broad language of the contract, there was no evidence that his primary duties consisted of spreading the Catholic faith; his role as organist did not play an integral or important role in religious ritual or worship. Consequently, [Moersen]'s position is distinguishable from that of *Assemany* and of choir directors. His basic duties were simply to play the organ at religious services."

Thus, the Court of Special Appeals held that Moersen's Title VII discrimination claim was not barred by the Free Exercise Clause of the First Amendment.

We agree with the Court of Special Appeals' assessment. Under the "primary duties" test, *see Rayburn*, 772 F.2d at 1169, to be deemed "non-secular," the respondent's role must "consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision in religious ritual and worship." *Id.* Cognizant that the "function of the position" is of greater importance than "ordination," we simply are not convinced that the respondent's role was supervisory in any respect, involved any form of church governance, or directly required the teaching or the spreading of the religious faith.

The petitioners acknowledge the respondent's denials which contradicted the terms of his contract, namely that he did not discharge certain of the enumerated duties and further that he did not support the Gospel of the church that employed him and, indeed, was openly critical of the Catholic faith. Nevertheless, they maintain that the respondent did not "merely" play the organ. For this Court to make such a characterization, they submit, is to subjectively determine what the respondent's responsibilities were, something the Free Exercise Clause was designed to protect. Moreover, the petitioners point out that, as the Court of Special Appeals acknowledged,

"music plays a vital role in a number of religious faiths," including in the Catholic faith, where music has deep religious significance. Therefore, they caution, a ruling in the respondent's favor on the issue *sub judice* would endorse governmental interference with religion, something constitutionally prohibited.

Whatever the role of music in the Catholic faith, this case involves the ministerial exception. That, in turn, implicates and requires examination of the role the respondent plays in the church. Its application, notwithstanding the undesirability of judicial intrusion in church governance and decision making, requires an examination of a complainant's duties and the place of that position in the Church hierarchy; some level of review of the disputed employee's role in the church must be conducted in order to determine whether the "ministerial exception" applies.

It is not enough to say that Moersen's music is central to the church's method of worship; it would be just as easy to say that the manufacturer of the organ contributes to the church's worship, or that the people involved in the upkeep of the organ and worship place contribute to the church's ability to maximize the participation in religious ritual. Where does one draw the line?, that is the question. As stated in a case cited by the petitioners, *Musante v. Notre Dame of Easton Church*, No. 301–CV–2352, 2004 WL 721774, *6 (D.Conn. Mar. 30, 2004), "the religious nature of the employer is not dispositive of the inquiry, since it is unlikely that a church custodian would ever be considered a ministerial employee."

The petitioners urge that, contrary to the reasoning of the Court of Special Appeals, the *Rayburn* primary duties test does not mean that, "participation alone [is] not enough." We do not agree. In *Rayburn*, the court considered whether the position of associate in pastoral care was important to the spiritual mission of the Seventh-day Adventist Church. 772 F.2d at 1169. Concluding that it was, the court stated:

"The role of an associate in pastoral care is so significant in the expression and realization of Seventh-day Adventist

beliefs that state intervention in the appointment process would excessively inhibit religious liberty. The associate in pastoral care at Sligo Church is, according to undisputed evidence, pastoral advisor to the Sabbath School that introduces children to the life of the church. She also leads small congregational groups in Bible study. As counselor and as pastor to the singles group, the associate in pastoral care is once again a liaison between the church as an institution and those whom it would touch with its message. Such counseling requires sensitivity both to the human problems of the congregation and to the church's message of comfort in the face of those problems. Never are people more in need of spiritual leadership than when they turn to a pastor for help in dealing with their most difficult moments. Finally, the selection of the associate in pastoral care to stand on the platform during services, to lead out the congregation during the church's solemn rites, and to preach occasionally from the pulpit places the imprimatur of the church upon that person as a worthy spiritual leader to whom members may look for consultation, example, and guidance in their own lives and in the life of the congregation as a corporate body."

*Id.*

While we cannot, and will not, comment on the effect that the respondent's organ music had on the congregation or the members of the choir, we do note that the significance of the respondent's position and the level of his participation is far different than the position occupied by the appellant in *Rayburn*. The respondent was not in absolute control of the music played, and he did not lead any choirs, teach any hymns, or control any part of the church services in which he participated. He was neither required to have specialized knowledge of the Catholic faith, nor expected to have any particular religious training. All he needed was knowledge of how to play an organ.

To be sure, as *Rayburn* recognizes, the ministerial exception does not apply only to those who have been ordained. Those persons who are not ordained and are untitled,

but who, in essence, perform ministerial roles are also covered. 772 F.2d at 1168–69. On this point, the petitioners argue that the respondent's involvement with the church and in the services was essential, that "we couldn't have done this with a C/D player ... [h]e didn't function like a wind-up music box ... The position called for a human being." That the respondent, however, could have been replaced easily by another qualified organ player underscores the non-ministerial-like nature of his position. That the position requires a human being is not dispositive. It is significant that it does not require a specific human being with specific religious-based qualification. His contract to the contrary notwithstanding, the duties that the respondent actually performed, while they occurred during church services, were not "ministerial" in any sense.

## D.

The cases on which the petitioners rely, although supportive of the proposition that "despite its name, it is well-recognized that the 'ministerial' exception applies to lay employees in addition to ordained ministers and clergy members," do not mandate a different result in the case *sub judice*. They are distinguishable. In each, the subject job or position had a far greater significance to the religious mission than does the respondent's position and, thus, the ministerial exception was appropriately applied.

In *Alicea–Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698, 700 (7th Cir.2003), at issue was the role of "Hispanic Communications Manager" at a Catholic church, whose duties included:

"composing media releases for the Hispanic community; composing correspondence for the Cardinal; developing a working relationship with the Hispanic media and parishes in the Hispanic community to promote Church activities; developing a working relationship with the Hispanic community to enhance community involvement; composing articles for Church publications; and translating Church materials into Spanish."

*Id.* The incumbent holder of that position claimed that she had been discriminated against based on her gender and race. *Id.*

Noting that "[i]n determining whether an employee is considered a minister for the purposes of applying this exception, we do not look to ordination but instead to the function of the position," 320 F.3d at 703, *citing Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d at 801, and stating the relevant inquiry, "whether Alicea–Hernandez's position as Hispanic Communications Manager can functionally be classified as ministerial," *id.* at 703, the court concluded that the appellant's position was covered by the exception. The court held:

> "the parties cite numerous cases dealing with positions such as teachers, music directors, and youth counselors, the cases provide limited guidance in making the determination required here. Unlike those positions, a press secretary is responsible for conveying the message of an organization to the public as a whole. A press secretary, as is evident from observing various public officials and entities, is often the primary communications link to the general populace. The role of the press secretary is critical in message dissemination, and a church's message, of course, is of singular importance. As the D.C. Circuit stated, '[D]etermination of whose voice speaks for the church is per se a religious matter.' *Minker v. Baltimore Annual Conference of the United Methodist Church*, 894 F.2d 1354, 1356 (D.C.Cir. 1990) (internal quotation marks omitted). Indeed, the rationale for the ministerial exception is founded upon the principle that 'perpetuation of a church's existence may depend upon those whom it selects to preach its values, teach its message, and interpret its doctrines both to its own membership and to the world at large.' . . .
>
> * * * *
>
> ". . . [The appellant] served as a liaison between the Church and the community to whom it directed its message. As Hispanic Communications Manager, Alicea-Hernandez was integral in shaping the message that the Church presented

to the Hispanic community. We therefore conclude that Alicea–Hernandez served a ministerial function for the Church and her Title VII claims are therefore barred by the First Amendment."

320 F.3d at 704 (footnotes and some citations omitted).

A teacher of English and religion at a Catholic school, who had been terminated by the Catholic school after she had publicly supported abortion, was held, in *Curay–Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 344 F.Supp.2d 923, 925 (D.Del.2004), to be covered by the ministerial exception. 344 F.Supp.2d at 932. There, although not owned by the church, religious principles were taught at the school so as to "indoctrinate[ ] its students according to those principles." 344 F.Supp.2d at 926. The appellant acknowledged that her role was to "teach those religious principles and inculcate them in [her] students." *Id.*

The court decided that the ministerial exception applied to the school employee. It reasoned:

"I am inclined to believe that a religion teacher at a parochial school does indeed fall within the ministerial exception, but I need not conclusively answer that question because, regardless of the answer, the deep respect for free exercise rights upon which the exception is based still requires extraordinary judicial caution when addressing claims by lay employees whose duties have religious significance.... Here, the alleged victim of gender discrimination was a parochial school teacher of religion and of English, the latter subject, as well as the former, giving rise to frequent discussion of moral issues, as both sides acknowledge.... Those religious implications are particularly clear in the circumstances of this case, in which the Plaintiff was fired during a controversy she helped create over the Catholic Church's long-established doctrinal opposition to abortion."

344 F.Supp.2d at 932–33.

The employee in *E.E.O.C. v. Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 795, 797 (4th Cir.2000) was the "Director of the Music Ministry," whose duties included:

"The proposed job description provided that the Director would be ... fully responsible for the Music Ministry of the Cathedral. It stated that the major duties of the position included: '[t]o assist in the planning of all Parish Liturgies; to direct the parish choirs; to teach the congregation to actively and vocally participate in the music of the Parish; to recruit and train cantors.' Austin's actual duties were then summarized in a handwritten document agreed to by her and Father Lewis. This document, like the proposed job description, assigned responsibility to Austin for the music program of the Cathedral and the Cathedral school. Among the duties listed were: teaching at the school; supervising and directing choirs; training cantors; and playing for holidays, weddings, and funerals. Austin was also required to approve music for weddings even if she was not available for the ceremonies. She was also made part of the Worship Committee and was required to attend the committee's monthly meetings and participate in seasonal liturgy planning."

213 F.3d at 798. She claimed that the church discriminated against her on the basis of sex. 213 F.3d at 797.

Focusing its analysis on " 'the function of the position' at issue and not on categorical notions of who is or is not a 'minister,' " 213 F.3d at 801, and characterizing the proper inquiry as " 'whether a position is important to the spiritual and pastoral mission of the church,' " *id.*, *citing Rayburn*, 772 F.2d at 1169 (internal quotation marks omitted), the court concluded that the ministerial exception applied. It explained:

"The functions of the positions are bound up in the selection, presentation, and teaching of music, which is an integral part of Catholic worship and belief. . . . To hold otherwise would require us to say that music is substantially devoid of spiritual significance in the life of the church. . . .

"At the heart of this case is the undeniable fact that music is a vital means of expressing and celebrating those beliefs which a religious community holds most sacred. Music is an integral part of many different religious traditions. . . . It serves a unique function in worship by virtue of its capacity

to uplift the spirit and manifest the relationship between the individual or congregation and the Almighty....

\* \* \* \*

"Thus, inasmuch as Austin's duties involve the expression of the church's musical tradition, it is a fallacy to denominate them as merely secular.... The efforts of a music minister or teacher can thus influence the spiritual and pastoral mission of the church as much as one who would lead the congregation in prayer, preach from the pulpit, or teach theology in school.

"Austin was clearly a pivotal figure in most, if not all, aspects of the musical life of the Cathedral and school. The various job descriptions for the music ministry positions, though not dispositive, unmistakably evince the religious significance of her music ministry. Austin was required to assist in the planning of liturgies and was in charge of the parish choirs-functions at the very heart of the church's musical life. The positions also entailed responsibility for recruiting choir members, cantors, and special musicians....

"The significance of Austin's role in the selection and presentation of religious music is highlighted by the interplay between music and other liturgical forms. The music at religious worship services is often tied to the seasons of the church year or the day's scripture readings. Indeed, Father O'Connor stated in his affidavit that Austin's role at the three weekly worship services was 'to choose music that reflected and enhanced the theme of the Scriptures of the day and that would assist the assembly of believers in their individual journeys of faith.' Father O'Connor also stated that Austin was involved in planning music for the special seasons of the year, such as Christmas and Easter, and for special feast days such as the Feast of Christ the King and the Feast of Pentecost. And even where Austin did not select the music herself, the subtle judgments that accompany the presentation and interpretation of sacred music contribute to its spiritual effect.

"Austin also served as a representative of the church to the congregation. She played a prominent role in worship services and helped to lead the congregation in song. The significance of her role was reinforced by the fact that Austin was listed on the front page of the Parish bulletin under 'Parish Staff,' along with the parish priests and a Pastoral Associate/Director of Religious Education. Austin was thus a visible (and audible) sign of the church's work through music, as well as a leader of the congregation in the church's musical, and therefore spiritual, life."

\* \* \* \*

"Indeed, Austin's duties at the Cathedral school appear to have gone far beyond the teaching of music classes. As Austin herself points out in exhibits attached to her affidavit, she was responsible for the music program of the school and served as a resource person for all musical activities in the school. She also assisted in the music preparation for school liturgies and played the piano at Mass. Austin was responsible for the school choir and school handbell choir. These duties, coupled with the spiritual significance of her teaching role, render her position at the Cathedral school 'ministerial' for purposes of the exception."

213 F.3d at 802–05.

In *Musante v. Notre Dame of Easton Church,* No. 301–CV–2352, 2004 WL 721774 (D.Conn. Mar. 30, 2004), the "Director of Religious Education at the Catholic church fell within the ministerial exception." 2004 WL 721774, \*6–7. There, the employee, who was "the Director of Religious Education and Pastoral Assistant," claimed she had been the victim of age discrimination. Her duties were:

"1) reading scripture and distributing Communion during the daily 7:30 a.m. Mass; 2) training eucharistic ministers and readers; 3) supervising the Lay Caring Ministry; and 4) visiting hospitals and homebound parishioners."

"[U]ndertak[ing] a fact-specific inquiry . . . to determine whether her duties at Notre Dame can be said to be 'important to the spiritual and pastoral mission of the church,'"

*citing Rayburn,* 772 F.2d at 1168–69, and stressing that her duties included reading scriptures and training ministers, the court held that the employee's job fell "easily under the rubric of teaching or spreading the faith." 2004 WL 721774, at *6.

Finally, the petitioners rely on *Shaliehsabou v. Hebrew Home of Greater Wash., Inc.,* 363 F.3d 299, 307 (4th Cir.2004). In *Shaliehsabou,* the employee, an Orthodox Jewish man, a mashgiach, or "an inspector appointed by a board of Orthodox rabbis to guard against any violation of the Jewish dietary laws," 363 F.3d at 301, sought to assert the Fair Labor Standards Act against his employer, a nursing home, the Hebrew House of Greater Washington. Significantly, it was established that there was "no secular health or safety rationale for the work performed by the [m]ashgichim," 363 F.3d at 302, who "[is] qualified under Judaic law to supervise the preparation of food to ensure that it is kosher," "must have a knowledge of the basic laws of kashruth," "generally have obtained their knowledge of the laws of kathruth through experience and study at 'yeshiva,' " and "possess the authority to enforce the laws of kathruth and make on-the-spot decisions based on their knowledge and understanding of the situation at hand." *Id.*

Citing the primary duties test established in *Rayburn,* the court opined:

> " . . . Shaliehsabou's duties required him to perform religious ritual. He supervised and participated in religious ritual and worship. Shaliehsabou was responsible for starting and kosherizing the ovens and cleansing kitchen utensils in accordance with the rules of kashruth. He also oversaw the preparation of kosher food, a key aspect of the Jewish halakha. . . . Importantly, it was his responsibility to consult with the Vaad for proper resolution of any concerns. In sum, we cannot say, given the importance of dietary laws to the Jewish religion, that the duties of mashgichim do not involve religious worship and ritual.
>
> "In addition to performing religious ritual, Shaliehsabou occupied a position that is central to the spiritual and

pastoral mission of Judaism. As a juridical religion, Judaism is dependent upon compliance with its laws, including the kashruth, and Shaliehsabou was the vessel through whom compliance with the kashruth was ensured for residents at the Hebrew Home.... Shaliehsabou, through his mashgiach tasks, performed sacerdotal duties. As Shaliehsabou has admitted, in the Jewish faith, non-compliance with dietary laws is a sin. As explained above, Jews view their dietary laws as divine commandments, and compliance therewith is as important to the spiritual well-being of its adherents as music and song are to the mission of the Catholic church. In short, failure to apply the ministerial exception in this case would denigrate the importance of keeping kosher to Orthodox Judaism."

363 F.3d at 309.

Moersen was not required to have any specialized knowledge of the Catholic faith. Stated another way, his lack of knowledge of many aspects of the Catholic faith did not prevent him from doing his job. This is unlike the plaintiff in *Shaliehsabou*, who, without very specific training, would not have been permitted to hold the position of mashgiach, much less perform that role.

Further comparisons with the cited cases display key differences. Unlike the employee in *Alicea–Hernandez*, Moersen was not the "voice" of the church. It was the Cantor that led the Parish and choir in song, and Moersen merely accompanied him. Not only did he not preach or inculcate values, he did not decide how the message was expressed. He was not, as the employee in *Curay–Cramer* was, in a teaching role, in a position where his own beliefs affected his ability to perform his job.

*Roman Catholic Diocese of Raleigh, N.C.* has similarities to the case *sub judice,* to be sure, but there are key differences as well. Moersen was not a "music minister." He was not a "pivotal figure" at the church, did not plan any liturgies himself, and he was not in charge of the church's "musical

life." He did not teach the choir any music, and he was not listed as Parish Staff.

The difference between the employee in *Musante* and Moersen is also dramatic. Moersen was not asked to train any ministers, and he was not in charge of reading scripture.

Furthermore, the cases involving an "employee in a musical position" that the petitioner cites to highlight the application of the ministerial exception do not further the petitioner's position.

*Assemany v. Archdiocese of Detroit,* 173 Mich.App. 752, 434 N.W.2d 233 (1988) does not stand for the general proposition that an organist position is covered by the ministerial exception. As the Court of Special Appeals explained, the court's holding that the organist was covered by the ministerial exception was based on reasons other than the employee's job title; the organist in *Assemany,* unlike the respondent, also was the head of the musical branch of the Catholic liturgy in the church, and had a "leadership role" in the parish. 434 N.W.2d at 238.

Similarly, in *Egan v. Hamline United Methodist Church,* 679 N.W.2d 350 (Minn.Ct.App.2004), the employee was the music director, "responsible for managing and rehearsing Hamline Methodist's choir, selecting and preparing music for regular Sunday services and other special services, playing the organ, and supervising other church music groups, such as the children's choir and the hand bell choir." 679 N.W.2d at 352. It was with reference to those duties that the court held that the ministerial exception applied:

"We recognize that music generally has a central and substantial role in expressing religious faith; it is often described as a 'ministry of music.' Music addresses the religious needs of church members and plays an integral part of the worship program. Egan states that his responsibilities include 'selecting and preparing' music for religious services. Clearly, Egan had to be familiar with the corpus of church music and theology to select the proper music for such services. In performing this task, he is expected to

consider the time in the church year, the scripture readings, the sermon topic, the church's basic faith principles, and other religious matters. That Title VII cases have considered music directors exempt from the protections of that act argues in favor of our concluding that a music director plays a religious role for [Minnesota Human Rights Act] purposes. Accepting the facts alleged in Egan's complaint as true, we cannot say the district court erred in finding as a matter of law that Egan was a religious employee."

679 N.W.2d at 356. Unlike the employee in *Egan*, the respondent did not lead any choirs, did not teach any music, and, with rare exceptions, the music he played was chosen for him.

In *Miller v. Bay View United Methodist Church*, 141 F.Supp.2d 1174 (E.D.Wis.2001), the church's "Music Director and Choir Director" alleged racial discrimination when he was fired by the church. 141 F.Supp.2d at 1175. The duties of "music Director and Choir Director" included "choos[ing] appropriate musical selections for the Sunday worship services and ... prepar[ing] and direct[ing] the choirs in leading the congregation in song," "research[ing] the religious themes of the upcoming services in religious books ... and ... select[ing] music that coincided with the religious themes and meanings of that particular services," 141 F.Supp.2d at 1178, as well as "[e]ncourag[ing] and promot[ing] Music Ministry outreach." *Id.*

Noting that "[w]here an individual's employment responsibilities are sufficiently ecclesiastical, a court may determine that it is precluded from scrutinizing a religious institution's allegedly discriminatory action in the employment context," 141 F.Supp.2d at 1181, the court decided that, in the case before it, "more was required [of the employee] than mere musical ability." 141 F.Supp.2d at 1182. The court held:

"The policy sections of both job descriptions state that music in worship rests upon the following 'music ministry keys,'-ministry, not performance, and members are more important than gorgeous music. Both job descriptions also contain a "Responsibilities and Expectations" section. The

Director of Music job description includes two responsibilities which are of particular significance with respect to religious criteria. The Director must 'ensure appropriate music for all regular services of the church' and 'encourage and promote [m]usic [m]inistry outreach.'

"Additionally, one of the responsibilities of the Chancel Choir Director job is, where possible, to choose music to fit the liturgy and or the lectionary. The policies, responsibilities and expectations of the jobs demonstrate that the defendant expected that a music ministry role be fulfilled by the Director of Music and the Choir Director.

\* \* \* \*

"Based on the foregoing, this court concludes that the plaintiff engaged in traditionally ecclesiastical or religious activities."

141 F.Supp.2d at 1182–83.

In *Starkman v. Evans*, 198 F.3d 173 (5th Cir.1999), the "Choirmaster and Director of Music," brought an action against the church at which she was employed, alleging a violation of the Americans with Disabilities Act. 198 F.3d at 174. Concluding that the ministerial exception applied to that position, the court explained:

"Although Ms. Starkman argues that she was hired strictly on the basis of her qualifications as a choir director, it is clear that her job requirements went above and beyond mere musical issues. To be certified as a Director of Music Ministry, she was not only required to have a masters in music, but also extensive course work in Church Music in Theory and Practice, Choral Conducting, Worship, Choral Vocal Methods, Hymnology, Bible, Theology, Christian Education, and United Methodist History, Doctrine and Polity. The job description for Director of Music, states that 'the Director of Music is responsible for the planning, recruiting, implementing and evaluating of music and congregational participation in all aspects of this ministry at Munholland United Methodist Church.' Furthermore, there is no dispute that religious music plays a highly important role in

the spiritual mission of the church. Thus, it seems clear that the job specifications required Ms. Starkman to be educated in religion and serve as a spiritual leader.

"Second, to constitute a minister for purposes of the 'ministerial exception,' the court must consider whether the plaintiff was qualified and authorized to perform the ceremonies of the Church.... Ms. Starkman had several religious duties and responsibilities. For example, she was required to plan worship liturgy, coordinate church and worship activities relating to the church's Music Ministry, rehearse with choirs and conduct those choirs, hire musicians and lower level music ministry directors, and write articles about the church's Music Ministry for the weekly church bulletin, introducing liturgical seasons for worship services....

\* \* \* \*

"Third, and probably most important, is whether Ms. Starkman 'engaged in activities traditionally considered ecclesiastical or religious,'... including whether the plaintiff 'attends to the religious needs of the faithful,'.... While Ms. Starkman claims that attending to the 'religious needs of the faithful' was not a primary duty, she admits that she was designated to be a 'ministerial presence' to ailing parishioners on occasion. She also concedes that, for her and her congregation, music constitutes a form of prayer that is an integral part of worship services and Scripture readings.

"The evidence, when examined in the light most favorable to the Plaintiff, indicates that Ms. Starkman did serve as a spiritual leader and thus properly falls under the rubric of this court's ministerial exception."

198 F.3d at 176–77 (citations omitted).

The respondent was not required "to plan worship liturgy, coordinate church and worship activities relating to the church's Music Ministry, rehearse with choirs and conduct those choirs, hire musicians and lower level music ministry directors, and write articles about the church's Music Ministry for the weekly church bulletin...."

Penultimately, the petitioners cite *Fassl v. Our Lady Perpetual Help Roman Catholic Church,* No. 05–CV–0404, 2005 WL 2455253 (E.D.Pa. Oct. 5, 2005). In that case, the employee was the Director of Music of the church that dismissed her, allegedly in violation of the American with Disabilities Act. Responding to the complaint, the church alleged:

"the necessary qualifications for its Director of Music go far beyond musical experience and skill. Rather, the qualifications for Director of Music include an ability to teach, to lead, and to evoke active participation of the people in all liturgical celebrations and an ability to work with the volunteers who freely give their time and talent to the group that the Church deems to be its music ministry. Thus, the position of Director of Music is significantly distinguished from that of purely custodial, clerical or office personnel. At this Church, the Director of Music reportedly requires a thorough 'understanding of and love for' the Liturgy of the Church and the relationship of music to the liturgical life of the Church."

In that case, the appellant herself admitted that her duties were ministerial in nature,

"she played, sang and/or directed three to five masses per weekend, planned music for liturgies, scheduled and trained the cantors, directed multiple Church choirs, chaired the 'Renew 2000' liturgy team, and prepared and played for penance services, all school liturgies, all other Holy Days, and contemporary and teen music groups among her enumerated duties."

The employee did not refute or attempt to refute the allegations describing her role in the "musical ministry" of the church, leading the court to the conclusion that they were true. 2005 WL 2455253, at *9. That was, the court held, dispositive. *Id.*

In *Hope Int'l Univ. v. Superior Court of Orange County,* 119 Cal.App.4th 719, 14 Cal.Rptr.3d 643, 655 (2004), the court opined that "individuals whose function is essentially liturgical, that is, connected to the religious or worship service of the

organization" are a "relatively easy case" of when the exception applies, and listed among the examples, "music and choir directors." That court also noted, however, that "purely secular work for a religious institution has been held not to come within the ministerial exception." 14 Cal.Rptr.3d at 656, *citing Smith v. Raleigh Dist. of N.C. Methodist Church,* 63 F.Supp.2d 694 (E.D.N.C.1999) (ministerial exception did not apply to church receptionist or pastor's secretary); *Lukaszewski v. Nazareth Hosp.,* 764 F.Supp. 57 (E.D.Pa.1991) (ministerial exception did not apply to director of plant operations at a religiously affiliated hospital). Here, Moersen was not a music director, he was not a choir director, and did not have any ministerial duties.

It is clear to this Court that the respondent did not perform any ministerial duties. As such, the ministerial exception does not apply to him, and he is free to pursue his employment discrimination claim.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.

HARRELL, J., files dissenting opinion joined by RAKER and CATHELL, JJ.

Dissenting Opinion by HARRELL, Judge, which RAKER and CATHELL, JJ., Join.

I respectfully dissent. The Majority opinion, in the process of minimizing the role played by Moersen as the organist for St. Catherine Labouré Parish ("the Parish"), as compared to more extensive musical ministry and other ecclesiastical positions examined by other courts, lost sight of the simple reality that because Moersen's "primary duties consist[ed] of ... participation in religious ritual and worship, he ... should be considered 'clergy.'" *Rayburn v. Gen. Conf. of Seventh–Day Adventists,* 772 F.2d 1164, 1169 (4th Cir.1985); *accord Montrose Christian Sch. Corp. v. Walsh,* 363 Md. 565, 590, 770 A.2d 111, 126 (2001). This is true regardless of whether one relies on the duties delineated in Moersen's employment contract, or the activities Moersen professes he actually performed as an

employee. Accordingly, I believe that this Court should have accepted the Archdiocese of Washington's argument invoking the "ministerial exception" to the prosecution of Moersen's Title VII cause of action, reversed the judgment of the Court of Special Appeals, and affirmed the Circuit Court's grant of summary judgment.

## I. The "Ministerial Exception"

As the Majority opinion necessarily acknowledges, there exists a "ministerial exception" to the application of the employment anti-discrimination measures codified in Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e-1(a). The U.S. Supreme Court upheld, against Establishment Clause attack, this exception in *Corporation of Presiding Bishop v. Amos,* 483 U.S. 327, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987), and this Court also adopted it in *Montrose Christian School Corp. v. Walsh.* The aim of the exception is to honor the promise of the Free Exercise Clause by placing sectarian matters outside of the subject matter jurisdiction of secular courts. *Bourne v. Ctr. on Children, Inc.,* 154 Md.App. 42, 54–55, 838 A.2d 371, 379 (2003).

The U.S. Court of Appeals for the Fourth Circuit declared that "[a]s a general rule, if the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship, he or she should be considered 'clergy.'" *Rayburn,* 772 F.2d at 1169 (quoting Bruce N. Bagni, *Discrimination in the Name of the Lord: A Critical Evaluation of Discrimination by Religious Organizations,* 79 COLUM. L.REV. 1514, 1545 (1979)); *accord Montrose,* 363 Md. at 590, 770 A.2d at 126. Rather than applying just to ministers and ordained clergy, the exception covers "any employee of a religious organization" engaged in the ministerial activities delineated by the Fourth Circuit in *Rayburn. Montrose,* 363 Md. at 590, 770 A.2d at 126; *see also Equal Employment Opportunity Comm'n v. Roman Catholic Diocese of Raleigh, N.C.,* 213 F.3d 795, 802 (4th Cir.2000) ("[T]he exception has not been limited to cases involving ordained ministers or

priests, but rather requires a fact-specific examination of the function of the position."); *see generally Serbian E. Orthodox Diocese for the U.S. & Canada v. Milivojevich,* 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976). The *Rayburn* court opined that "[t]his approach necessarily requires a court to determine whether a position is important to the spiritual and pastoral mission of the church." 772 F.2d at 1169.

## II. Moersen's Employment Contract Indicates Clearly that His Position is "Ministerial"

In order to determine whether a given employee's position within a sectarian organization should be deemed "ministerial," many courts have been guided either by the language contained in the employment contract binding the religious organization and the employee, or by the job description created by the religious organization in summarizing the duties of the employee.

In *Diocese of Raleigh,* the Fourth Circuit reviewed "[t]he various job descriptions for the music ministry positions, though not dispositive," in ruling that a music director and music teacher at a Catholic church and elementary school fulfilled a ministerial role. 213 F.3d at 803. In *Tomic v. Catholic Diocese of Peoria,* 442 F.3d 1036 (7th Cir.2006), Richard Tomic, a music director and organist for the Diocese of Peoria and St. Mary's Cathedral, sued both entities for discrimination when he was dismissed from employment. Judge Posner, writing for the U.S. Court of Appeals for the Seventh Circuit, turned to the job descriptions developed by the diocese and the church for guidance in determining that Tomic's position was truly ministerial. *Tomic,* 442 F.3d at 1037. In *Scharon v. St. Luke's Episcopal Presbyterian Hospitals,* 929 F.2d 360 (8th Cir.1991), a federal appellate court was persuaded by the job description of a hospital chaplain in designating that employee's position as ministerial. 929 F.2d at 362–63. In *Starkman v. Evans,* 198 F.3d 173 (5th Cir. 1999), another federal appellate court utilized the job description of an employee's position in its analysis of whether that position was ministerial. 198 F.3d at 176. In *Shirkey v.*

*Eastwind Community Development Corp.*, 941 F.Supp. 567 (1996), the U.S. District Court for the District of Maryland concluded that, based solely on the job description approved by the defendant religious organization, the position sought by a job applicant was not ministerial. 941 F.Supp. at 577–78. Another federal trial court, in *Miller v. Bay View United Methodist Church, Inc.*, 141 F.Supp.2d 1174 (E.D.Wis.2001), relied on the job description provided by the church in ruling that an employee's role was ministerial. 141 F.Supp.2d at 1181–82. Even in *Assemany v. Archdiocese of Detroit,* 173 Mich.App. 752, 434 N.W.2d 233 (1988), a case relied upon by the Majority opinion, the court took great pains to detail the contractual duties assigned to the organist, Assemany. 434 N.W.2d at 235–36. It was to those duties that the *Assemany* court looked in concluding that the organist position in that case was ministerial. 434 N.W.2d at 238.

A similar analytical approach is appropriate here. The case was disposed of in the Circuit Court on summary judgment. There was no genuine dispute between the parties as to Moersen's contractual duties. The Majority opinion quotes Moersen's employment contract with the Parish with respect to his duties as "Organist/Pianist/Keyboard Accompanist:"

*Job objectives:*

To Support the Gospel message through the music ministry of Saint Catherine Laboure Church and to encourage the congregation to assume as active part in their musical participation at all liturgical parish functions.

*Job description:*

To provide Organ/Piano/Keyboard Music and/or musical accompaniment to both the congregation and the choirs of Saint Catherine Laboure Church at the 10:30 a.m., 12:00 noon and 1:15 p.m. Sunday services; to provide the same at the weekly Saturday 5:15 p.m. service; to provide same at special liturgical celebrations as listed below; to provide musical accompaniment for the congregation at the 7:00 p.m. Monday night weekly novena service.

2. *Responsibilities of the organist:*

a. To build and sustain congregational song at all liturgies.

b. To assist in selecting music associated with the worship at all liturgies in which he/she participates.

c. To assist in planning the music associated with the above mentioned liturgies.

d. To participate in special liturgical celebrations when requested, especially Christmas, Lenten and Easter liturgies, Confirmation, First Communion, and Reconciliation liturgies.

e. To work under the very general supervision of the choir directors of the Liturgical choir and the Hispanic Choir.

f. To attend parish staff meetings when appropriate.

3. *Related job requirements:*

a. The organist reports to the director of the choir concerning music and also has, as needed, access to the pastor who is ultimately the person to whom the organist must answer to regarding job related issues.

b. The organist shall be an ex officio member of all committees concerning liturgy.

c. The organist will accept engagements to assist at weddings and funerals and when he is unable to accept such engagements he will recommend suitable substitutes if he is asked to do so. The fees for these services will be a matter between the organist and the party requesting his services.

Maj. op. 339 Md. at 645–46, 925 A.2d at 663–64.

As to these duties and responsibilities, it is clear to me that Moersen's position was of a ministerial nature. The objective of his position was "[t]o Support the Gospel message through the music ministry of Saint Catherine Laboure Church" and to encourage congregational participation in the liturgies though music. A position entailing the performance of religious music, for a church during its religious services, to a religious end cannot possibly be perceived as anything but religious. Moer-

sen's contract tasked him with planning and playing music as an accompaniment to the religious hymns sung by the choir and the congregation. He was required to attend Parish staff meetings and was considered an ex officio member of all committees relating to the liturgies in which he performed. Under these circumstances, the contractual relationship between the Parish and Moersen steeped Moersen in duties and responsibilities "that primar[il]y ... consist of ... participation in religious ritual and worship...." *Rayburn*, 772 F.2d at 1169.

The Majority opinion, however, ignored the overtly religious duties assigned to Moersen and instead accepted Moersen's characterization of his role at the Parish. Curiously, the Majority opinion, like the misguided intermediate appellate court here, neglected to consider the number of cases catalogued above where courts looked to the terms of an employee's contract or the job description applicable to the employee's position for guidance. The Majority opinion should not be allowed to escape the relevance of the employee's job description being a stronger consideration. In surveying analogous cases, the Majority opinion itself recites from at least four cases where an employee's job description was weighed explicitly by courts in making an assessment of whether a position was ministerial. Maj. op. 399 Md. at 649–52, 658–59, 665–66, 666–67, 925 A.2d at 666–67, 671, 675–76, 676 (citing *Assemany, Diocese of Raleigh, Miller,* and *Starkman*). Indeed, the Majority opinion is forced to acknowledge the religious nature of Moersen's job description, yet sidesteps it unsatisfactorily by relying on Moersen's incomplete job performance as reason, for purposes of its analysis, to ignore the religious duties the Parish entrusted to Moersen. Maj. op. 399 Md. at 656–57, 925 A.2d at 670 ("His contract to the contrary notwithstanding, the duties that the respondent actually performed, while they occurred during church services, were not 'ministerial' in any sense.").

III. Moersen's Role Solely as an Organist was Ministerial

Even with the Court majority confining its consideration to Moersen's averment that he only played the organ, I nonethe-

less conclude that his position was a ministerial one. My opinion is compelled by nothing less than the simple reality that playing the organ for religious services at a Catholic church is an important facilitation of the liturgies in which Moersen participated, obviously an activity "important to the spiritual and pastoral mission of the church." *Rayburn,* 772 F.2d at 1169.

Many jurisdictions have opined on the obvious sectarian significance of music as played during religious services. The Fourth Circuit, in *Diocese of Raleigh,* stated that it is an "undeniable fact that music is a vital means of expressing and celebrating those beliefs which a religious community holds most sacred." 213 F.3d at 802; *see also Starkman,* 198 F.3d at 176 ("[T]here is no dispute that religious music plays a highly important role in the spiritual mission of the church."); *Tomic,* 442 F.3d at 1041. There is also no shortage of facts adduced by the Archdiocese of Washington that music occupies a scared position in Catholic worship. In particular, the Archdiocese asserted that "the pipe organ is to be held in high esteem, for it is the traditional musical instrument that adds a wonderful splendor to the Church's ceremonies and powerfully lifts up the spirit to God and to higher things." *Constitution on the Liturgy, Sacrosanctum Councilium,* 4 December 1963. Despite this convincing evidence,[1] both the Court of Special Appeals and the Majority in this Court downplay unsatisfactorily Moersen's role.

The fact remains that because music inheres a vital liturgical significance, the performance of that music is equally as significant. Although Moersen contends that he is "just an organ player," his apt performance of sacred and reverent music during worship services belies a secular characterization of his role. Moersen, as the organist, was an active participant in liturgies in a way that an organ manufacturer or a person who merely tunes the organ is not. *See Tomic,* 442 F.3d at 1041. Despite Moersen's arguments, I am persuaded

---

1. The Court of Special Appeals also accepted this and acknowledged that "music is generally an important part of the Catholic faith...."

that there is no such thing as "just an organ player" in religious rituals and ceremonies such as those in which Moersen performed. I am not alone in this view.

In *Tomic*, Richard Tomic, a music director and organist, portrayed his involvement with his church employer in much the same manner as does Moersen here:

> [s]o far as his role as organist is concerned, his lawyer says that all Tomic did was play music. But there is no one way to play music. If Tomic played the organ with a rock and roll beat, or played excerpts from *Jesus Christ Superstar*, at an Easter Mass, he would be altering the religious experience of the parishioners.

442 F.3d at 1040. In view of this reality, the Seventh Circuit held that "Tomic 'performed tasks that were "traditionally ecclesiastical or religious." ' " *Tomic*, 442 F.3d at 1041. In Diocese of Raleigh, the Fourth Circuit noted of a music director tasked with selecting and playing music for worship services that "even when Austin did not select the music herself, the subtle judgments that accompany the presentation and interpretation of sacred music contribute to its spiritual effect." 213 F.3d at 803. The *Diocese of Raleigh* court then struck the same note as did the Tomic court in addressing the difficulty of accepting an argument such as Moersen's that simply playing the organ has no religious importance:

> Indeed, it is not easy to divorce even the more technical aspects of music from its significance in religious worship. Whether a selection is played *adagio* or *andante* can have a profound effect on the religious worship and vocal participation of the congregation. And different performances of the same musical piece can evoke different responses.

213 F.3d at 804. Even though Moersen did not also fulfill the role of music director, he nonetheless served, for all intents and purposes, as "the primary human vessel through whom the church chose to spread its message in song." *Id.* The role of church organist almost certainly would be included at the epicenter of religious activity as described by Professor Bagni, whom the Fourth Circuit quoted in *Rayburn* in setting out the

"primary duties" test.[2] G. Sidney Buchanan, *The Power of Government to Regulate Class Discrimination by Religious Entities: A Study in Conflicting Values,* 43 EMORY L.J. 1189, 1210 (1994) (discussing Bagni, *supra,* 79 COLUM. L.REV. at 1539).

Relatedly, I perceive that the Majority opinion makes too much of the leadership role and more extensive responsibilities of music directors and other ecclesiastical figures as contrasted to a "mere" organist in deciding whether either position is ministerial. As I have pointed out already, at least two federal appellate courts have noted that the manner in which religious music is played is, by itself, a matter of religious significance without regard to whether the performer selected that music. Further, the *Diocese of Raleigh* court opined that simply because an employee is answerable to a superior on spiritual matters, that fact does not *de jure* relegate that employee to any less of a religiously significant role; rather, it is just one factor to consider. 213 F.3d at 803. What is more important is whether the employee's "primary duties consist of . . . participation in religious ritual and worship." *Rayburn,* 772 F.2d at 1169.

It is telling that the "primary duties" inquiry was dispositive in one of the cases relied upon by the Majority opinion and the Court of Special Appeals. In *Assemany,* George Assemany served as music director and organist for Gesu Parish in the Detroit area. In finding that Assemany's position was ministerial, the Court of Appeals of Michigan held that he was "more than just an organist." 434 N.W.2d at 238. The Majority opinion incorrectly seizes upon this language as proof positive that all church employees, including Moersen, who only play the organ, are not ministerial employees. To do so ignores the real test to be applied; the "primary duties" test, which was utilized in *Assemany.* In the paragraph preceding

---

**2.** *Rayburn v. Gen. Conf. of Seventh–Day Adventists,* 772 F.2d 1164, 1169 (4th Cir.1985) (quoting Bruce N. Bagni, *Discrimination in the Name of the Lord: A Critical Evaluation of Discrimination by Religious Organizations,* 79 COLUM. L.REV. 1514, 1545 (1979)).

the "more than just an organist" language, the *Assemany* court found that the employee's "primary responsibility was to enable and encourage the Gesu choir and congregation to participate in the Catholic liturgy through song." 434 N.W.2d at 238. Surely, this same evaluation must be made of Moersen in his role as the organist at St. Catherine Labouré Parish. Although he alleges that he did not select the music to be played at liturgy, he nonetheless enabled and encouraged both the choir and the congregation to worship through music. Again, Moersen did not have to be in a position of leadership to impact the Parish's liturgies through his exercise of his primary responsibilities. *Diocese of Raleigh,* 213 F.3d at 803.

For the reasons expressed above, I would hold that Moersen's role was ministerial, thus placing his employment discrimination claim outside of our secular jurisdiction. Accordingly, the judgment of the Court of Special Appeals should be reversed and the matter remanded to that Court with directions to affirm the judgment of the Circuit Court for Prince George's County.

Judges RAKER and CATHELL authorized me to state that they join the views expressed in this dissent.