28 A.3d 1171

**PRINCE OF PEACE LUTHERAN CHURCH, et al.**

v.

**Mary LINKLATER.**

**No. 66, Sept. Term, 2009.**

Court of Appeals of Maryland.

Sept. 21, 2011.

666

John L. Cooley (John Mark Cooley of WootonHart PLC, Roanoke, Virginia; Stephen C. Thienel of Thienel Law Firm, LLC, Columbia, MD; Mitchell Y. Mirviss of Venable LLP, Baltimore, MD; Peter G. Byrnes, Jr. of Bennett & Albright,

P.A., Baltimore, MD; and Mindy G. Farber of Farber Legal, LLC, Bethesda, MD), all on brief, for petitioner/cross–respondents.

Thomas S. Martin (Amanda Kosonen and Keith R. Palfin of Shearman & Sterling LLP, Washington, D.C.), on brief, for respondent/cross–petitioner.

Warren Kaplan (Susan Huhta and Emily Read of Washington Lawyers' Committee for Civil Rights and Urban Affairs, Washington, D.C.), on brief, for respondent/cross–petitioner.

Alan R. Kabat, Esq., Bernabei & Wachtel, PLLC, Leslie D. Alderman III, Esq., Alderman, Devorsetz & Hora, PLLC, Washington, D.C., Kathleen Cahill, Esq., Law Offices of Kathleen Cahill, LLC, Towson, MD, for Amicus Curiae brief of Metropolitan Washington Employment Lawyers Association and Maryland Employment Lawyers Association.

Monisha Cherayil, Esq., Murnaghan Appellate Advocacy Fellow, Baltimore, MD, for Amicus Curiae brief of Public Justice Center.

Deborah Liu, Esq., People for the American Way Foundation, Washington DC, Marci A. Hamilton, Esq., Washington Crossing, PA, for Amicus Curiae brief of People for the American Way Foundation.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

MURPHY, J.

In the case at bar, this Court granted both a petition and cross-petition for a writ of certiorari to address two issues of public importance: (1) the extent to which the First Amendment's "ministerial exception" is applicable to a sixteen count civil action asserted against a church by a former employee who claims that she was the victim of sexual harassment and employment discrimination; and (2) whether the former employee's "hostile work environment" claim was timely filed under the "continuing violation doctrine" exception to the applicable statute of limitations. 409 Md. 47, 972 A.2d 861

(2009). Before addressing these issues, however, it is necessary that we clear away a good deal of flotsam and jetsam produced by the two hundred seventy-five paragraph,[1] fifty-one page Complaint in which the former employee asserted her sixteen claims.

At this point in these needlessly complicated proceedings, there are four Petitioners/Cross Respondents ("Petitioners"): (1) Prince of Peace Lutheran Church ("the Church"), (2) Rufus S. Lusk, III ("Lusk"), (3) the Metropolitan Washington D.C. Synod of the Evangelical Lutheran Church in America ("the Synod"), and (4) Bishop Theodore Schneider ("Schneider"). Having ultimately prevailed in the Circuit Court for Montgomery County, they argue that the Court of Special Appeals has erroneously concluded that Respondent/Cross Petitioner, Mary Linklater (Respondent) is entitled to a new trial on four of the claims asserted in her Complaint.[2] Respondent, who

---

1.  Maryland Rule 2–303(a), in pertinent part, provides that a pleading "shall not include argument, unnecessary recital of law, evidence, or documents, or any immaterial, impertinent, or scandalous matter." The numerous violations of this rule that can be found throughout Respondent's Complaint begin with the first sentence of the first paragraph, which states: "This case chronicles the unsuccessful survival efforts of a talented, dedicated and outstanding musician and Music Director, who after four years of devoted and stellar performance, was maliciously and vindictively driven out of her job and a large part of her life, for no greater offense than rejecting the long-running harassment and sexual overtures of her superiors: the church pastor and the President of the Church Council." Our review of this Complaint prompts us to remind the bench and bar that Maryland Rule 2–322(e), in pertinent part, provides that "on the court's own initiative at any time, the court may order ... any pleading that is late or otherwise not in compliance with [the Maryland Rules of Procedure] stricken in its entirety."

2.  Petitioners have requested that this Court answer four questions:
    1.  Whether the ministerial exception is limited to matters that would require a court to decide an issue of religious scripture or dogma or whether it applies more broadly to matters of church governance, such as a pastor's report to a church congregation during a church annual meeting?
    2.  Whether the continuing violation principle applies to claims under Art. 49B § 42, and if so, whether merely alleging a discrete and separate of retaliation can save otherwise different, untimely sexual harassment claims?

was awarded compensatory and punitive damages by a jury, argues that the Court of Special Appeals has erroneously concluded that she is not entitled to the entry of a judgment that conforms to that verdict.[3] For the reasons that follow, we hold that (1) the ministerial exception does not apply to two of the claims that Respondent has asserted, and (2) the "continuing violation doctrine" is applicable to those claims.

## Background

As the issues before us involve questions of law rather than questions of fact, there is no need to set forth each and every item of conflicting evidence in the record of this "she said,

---

3. Whether individuals can be personally liable as an employer under the Montgomery County Code?
4. Whether Md.Code Ann. Art. 49B § 42 violates equal protection by allowing Montgomery County to create claims and liabilities for employees and employers in Montgomery County that do not exist in Maryland's other jurisdictions?

**3.** Respondent has requested that we answer six questions:

1) Does the ministerial exception bar claims for negligent retention and supervision or evidence of other permitted claims, including sexual harassment, retaliation, and hostile work environment when the claims are unrelated to any employment decision, religious doctrine, or religiously motivated conduct?
2) Whether the continuing violation doctrine applies to claims under Art. 49B § 42 when conduct contributing to a hostile work environment falls within the limitations period?
3) Can sexual harassment and retaliation by a pastor toward a subordinate employee, including a year-long campaign to demoralize, humiliate, discredit, and ostracize that employee and drive her from the church, while knowing of her emotional fragility, satisfy the "extreme and outrageous" element of a claim for intentional infliction of emotional distress (IIED)?
4) Whether a jury verdict can be set aside and a new trial ordered based upon a finding that evidence financial means admitted in a non-bifurcated trial constituted procedural error given that (a) trial bifurcation is not mandatory; (b) there was no prejudice to the defendants; and (c) the evidence was admitted without objection?
5) Whether the Montgomery County Code's use of "person", expressly defined to include "an individual," applies to individuals?
6) Whether Md.Code Ann. Art. 49B § 42 violates equal protection when the Maryland legislature acted reasonably to enact a statute buttressing county anti-discrimination laws and when territorial uniformity is not a constitutional requirement?

they said" case.[4]   Suffice it to say that the evidence was sufficient to establish that Respondent (1) was the victim of sexual harassment, (2) complained about the harassment, and (3) was the victim of additional harassment and retaliation as a result of her complaints.

On October 16, 2002, Respondent filed a Complaint against the Petitioners in which she asserted the following causes of action:

## COUNT I

### Sexual Harassment and Hostile Work Environment Against all Defendants

\* \* \*

## COUNT II

### Quid Pro Quo Sexual Harassment Against all Defendants

\* \* \*

## COUNT III

---

**4.**   The record includes a *"JOINT PRE–TRIAL STATEMENT"* that contains the following information:

I.  *Nature of the Case*

In this case, plaintiff, Mary Linklater, the former Music Director of defendant, Prince of Peace Lutheran Church, claims that she was the victim of intentional infliction of emotional distress;  invasion of privacy and false light;  and injurious falsehood.

Defendants Prince of Peace Lutheran Church ("Prince of Peace") and Pastor Rufus S. Lusk III ("Pastor Lusk") vehemently deny Ms. Linklater's claims.  Specifically, defendants contend that Ms. Linklater's claims are prohibited by the First Amendment of the United States Constitution and the doctrine of charitable immunity.  Defendants further maintain that there is absolutely no evidence of any actionable false statements nor intentional infliction of emotional distress.  As a result, they dispute all allegations of liability and damages.

Gender Discrimination
Against all Defendants

\* \* \*

Count IV

Retaliatory Harassment and Constructive Discharge
Against All Defendants

\* \* \*

Count V

Intentional Infliction of Emotional Distress
Against All Defendants

\* \* \*

Count VI

Invasion of Privacy and False Light
Against all Defendants

\* \* \*

Count VII

Fraud
Against All Defendants

\* \* \*

Count VIII

Injurious Falsehood
Against Defendants Lusk, Schneider and D.C. Metropolitan Synod

\* \* \*

## Count IX

### Tortious Interference With Business Relations
### Against Defendants Lusk, Schneider, and D.C. Metropolitan Synod

\* \* \*

## Count X

### Negligent Retention and Supervision
### Against Defendants Prince of Peace and D.C. Metropolitan Synod

\* \* \*

## Count XI

### Respondeat Superior
### Against All Defendants Prince of Peace and D.C. Metropolitan Synod.

\* \* \*

## Count XII

### Conspiracy
### Against All Defendants

\* \* \*

## Count XIII

### Aiding and Abetting
### Against All Defendants

\* \* \*

## Count XIV

Breach of Contract
Against Defendants Schneider and the D.C. Metropolitan
Synod

\* \* \*

Count XV

Breach of Implied Contract
Against Defendant Prince of Peace

\* \* \*

Count [XVI]

Breach of Fiduciary Duty
Against Defendant Schneider

Respondent's Complaint included the following assertions:

160.   On March 4, 2001, [Respondent] found a defaced picture of herself that had been horribly stabbed numerous times, stuck to a bulletin board on the wall of the church next to the music room where [Respondent] worked.  [Respondent] was extremely distraught by this hateful act, and immediately fled the church.

161.   Over the course of the next three days, [Respondent] suffered from disabling emotional and psychological distress. . . . [Respondent] continuously agonized over her circumstances, and the defaced photo, which symbolized a great hatred of her that was felt by others—others who had previously been her friends and supporters. . . .

162.   By March 7, 2001, [Respondent] concluded that the environment at Prince of Peace had become so hostile and hateful and intimidating that, emotionally and psychologically, she simply could no longer bring herself to come in to work, unless there was a dramatic and fundamental improvement in the work environment. . . .

Respondent's Complaint included the following *Prayer for Relief:*

WHEREFORE, [Respondent] respectfully requests that this Court enter judgment:

A. declaring that the acts complained of herein are in violation of the laws of the State of Maryland and Montgomery County Code § 27–19;

B. directing Defendants to make [Respondent] whole for all earnings and other job benefits she would have received but for Defendants' unlawful conduct, including but not limited to, wages, retirement benefits, bonuses, and other lost benefits, plus pre-judgment and post-judgment interest;

C. directing Defendants to pay [Respondent] compensatory damages, including damages for her mental anguish and psychological treatment in an amount appropriate to the proof at trial;

D. awarding [Respondent] punitive damages in an amount appropriate to the proof at trial;

E. awarding [Respondent] the costs of this action, including reasonable attorneys' fees; and

F. granting such other and further relief as this Court Deems necessary and proper.

The first Circuit Court ruling of consequence occurred on March 10, 2003, when the pretrial motions hearing court resolved Petitioners' motions to dismiss in an on-the-record proceeding during which it stated:

In deciding the motion to dismiss as to the first amendment issues that have been raised, I decided that what I needed to do was look at the allegations in each count of the complaint and determine on a claim-by-claim basis whether or not the issues raised constituted—and I'm quoting from which case is this, *McKelvey v. Pierce* [, 173 N.J. 26, 800 A.2d 840 (2002),] which, although none of these cases are technically binding, I felt that this language was instructive as to the analysis the Court needed to conduct. And that was requiring an assessment of every issue raised in terms of doctrinal and administrative intrusion and entanglement.

I thought that was a pretty good description for the process we were required to go through.

The Court is going to grant the motion to dismiss as to Counts 4, 9, 10, 12, 13, 14, 15, 16 and denying the motion to dismiss as to the remaining counts. I did also consider separately the statute of limitations arguments that have been raised with respect to the remaining counts and do not find that they are barred by the statute of limitations, at least for motions to dismiss purposes. So the counts remaining are 1, 2, 3, 5, 6, 7, 8, 11.

The second Circuit Court ruling of consequence occurred on January 19, 2005, when the trial court filed a Memorandum Opinion and Order that included the following findings and conclusions:

The issues presented [by the Petitioners in their Motions for Summary Judgment] were: (1) Whether the ecclesiastical exception bars Ms. Linklater's causes of actions against all of the Defendants; (2) Whether the Statute of Limitations has already run for Ms. Linklater's Montgomery County Code causes of actions (Counts I–III); and (3) Whether Ms. Linklater has presented enough evidence to establish a claim on any of the counts?

* * *

A. The Ecclesiastical Exception

1) Bishop Schneider and the Synod

This Court finds that the ministerial exception bars Ms. Linklater's claims as they apply to the Defendants Bishop Schneider and Synod. Bishop Schneider became involved in this litigation matter only to help resolve ongoing conflicts in the Prince of Peace church between Pastor Lusk, Neil Howard, and Ms. Linklater. The Bishop and the Synod were not Ms. Linklater's employers and were never accused of sexually harassing her. Rather the Bishop worked with Ms. Linklater, Pastor Lusk, and Howard only to mend the rifts that had developed in Prince of Peace. Once Ms. Linklater elected to file a formal complaint with the Montgomery County Human Relations Commission, the Bishop

was no longer involved in the matter. The Bishop was merely acting in his role as Bishop, and therefore this Court finds that the First Amendment prohibits Ms. Linklater from pursuing any of her claims against Bishop Schneider or the Metropolitan Washington, D.C. Synod of the Evangelical Lutheran Church in America.

2) Pastor Lusk and Prince of Peace

\* \* \*

In the case at bar, Ms. Linklater's claims derive from the alleged sexual harassment by [a fellow employee] and Pastor Lusk and the alleged statements that publicly discredited her. She is not challenging any employment decisions regarding her termination in March 2001. Numerous courts have recognized that tort claims based on harassment are not barred by the First Amendment. . . . In as much as Ms. Linklater's claims do not implicate any employment decisions or religious beliefs of Prince of Peace, the First Amendment's ecclesiastical exception will not bar her causes of action as they relate to Pastor Lusk and Prince of Peace.

B. Statute of Limitations

Counts I–III of Ms. Linklater's suit pertains to the Montgomery County Code and therefore are subject to the statute of limitations enunciated in the Maryland Code pertaining to discriminatory acts in violation of the Montgomery County Code. Pursuant to MD. CODE ANN. ART. 49B § 42 (1997), "[a]n action . . . of this section shall be commenced in the circuit court for the county in which the alleged discrimination took place not later than two years after the occurrence of the alleged discriminatory act."

Ms. Linklater filed suit on October 16, 2002. If the causes of action occurred before October 16, 2000, Ms. Linklater's claims are untenable. [The fellow employee's] inappropriate conduct could not have continued after he resigned on July 15, 2000. According to Ms. Linklater's deposition Pastor Lusk's alleged sexual harassment ended on March 18, 2000. Thus, the statute of limitations has

already run as it pertains to [the fellow employee] and Pastor Lusk.

Additionally, Ms. Linklater made her claims against [the fellow employee] and Lusk public on July 19, 2000. All of the actions taken by Pastor Lusk and the church which occurred after July 19, 2000 implicate the ministerial exception discussed above because they are not relevant to the harassment and abusive treatment alleged by Ms. Linklater, but rather with an employment decision of the church. A close reading of *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 [122 S.Ct. 2061, 153 L.Ed.2d 106] (2002), indicates that hostile work environment claims primarily focused on acts which occur beyond the statute of limitations can be filed as long as at least one event occurred within the statute of limitations period. This court finds *Morgan* has no bearing on the case at bar because any actions which occurred after October 16, 2000 were effectively barred by the ministerial exception.

Therefore, since there is only a two year statute of limitations for Counts I–III and the basis for the causes of action occurred before October 16, 2000 these counts will be dismissed.

\*　　\*　　\*

IV. Conclusion

In light of the findings of this Court, the Defendants, Bishop Theodore Schneider, and the Metropolitan Washington, DC Synod of the Evangelical Lutheran Church in America's Motion for Summary Judgment is granted.

The Defendants Prince of Peace Lutheran Church and Pastor Rufus Lusk's, Motion for Summary Judgment is granted in part reversed in part. Count I, Sexual Harassment and Hostile Work Environment in violation of the Montgomery County Code; Count II, Quid Pro Quo Sexual Harassment, in violation of the Montgomery County Code; Count III Gender Discrimination in violation of the Montgomery County Code; Count VII, Fraud; and Count XI, Respondeat Superior have all been dismissed for the rea-

sons stated above. As the motion pertains to Count V, Intentional Infliction of Emotional Distress; Count VI, Invasion of Privacy and False Light; Count VIII, Injurious Falsehood, this Court denies the Motion for Summary Judgment.

Prior to trial, Lusk and the Church filed a motion in limine to exclude any evidence of Lusk's net worth, but the Circuit Court made no pretrial ruling on that issue. At trial, Respondent introduced into evidence a financial statement that listed the income and marital property of both Lusk and his wife. The trial court entered a judgment in favor of Petitioners on Respondent's injurious falsehood claim, so only Count V (the IIED claim), and Count VI (the invasion of privacy and false light claim) were submitted to the jury.

The jury returned its verdicts on a "special" *VERDICT SHEET* that includes the following questions and answers:

1. Do you find, by a preponderance of the evidence, that the Plaintiff, Mary Linklater, suffered Intentional Infliction of Emotional Distress by the Defendant, Prince of Peace Lutheran Church?

Yes __X__ No ____

*If "yes" proceed to question No. 2; if "no" proceed to Question No. 6.*

2. Do you find, by a preponderance of the evidence, that compensatory damages should be awarded on this claim of Intentional Infliction of Emotional Distress?

Yes __X__ No ____

*If "yes" proceed to question No. 3; if "no" proceed to Question No. 4.*

3. In what amount should compensatory damages be awarded for the claim of Intentional Infliction of Emotional Distress?

*$50,000.00*

4. Do you find, by clear and convincing evidence that punitive damages should be awarded on this claim of Intentional Infliction of Emotional Distress?

Yes __ No **X**

*If "yes" proceed to question No. 5; if "no" proceed to Question No. 6.*

*     *     *

6. Do you find, by a preponderance of the evidence, that the Plaintiff, Mary Linklater, suffered Intentional Infliction of Emotional Distress by the Defendant, Rufus Lusk?

Yes **X** No __

*If "yes" proceed to question No. 7; if "no" proceed to Question No. 11.*

7. Do you find, by a preponderance of the evidence, that compensatory damages should be awarded on this claim of Intentional Infliction of Emotional Distress?

Yes **X** No __

*If "yes" proceed to question No. 8; if "no" proceed to Question No. 9.*

8. In what amount should compensatory damages be awarded for the claim of Intentional Infliction of Emotional Distress? (Note: Do not award any damages that may already have been awarded in Question No. 3 if you have answered Question No. 3.)

*$300,000.00*

9. Do you find, by a clear and convincing evidence that punitive damages should be awarded on this claim of Intentional Infliction of Emotional Distress?

Yes **X** No __

*If "yes" proceed to question No. 10; if "no" proceed to Question No. 11.*

10. In what amount should punitive damages against Rufus Lusk be awarded for the claim of Intentional Infliction of Emotional Distress?

*$1,000,000.00*

11. Do you find, by a preponderance of the evidence, that the Plaintiff, Mary Linklater, suffered False Light, Invasion

of Privacy by the Defendant, Prince of Peace Lutheran Church?

Yes ___ No  **X**

*If "yes" proceed to question No. 12; if "no" proceed to Question No. 16.*

\* \* \*

16. Do you find by a preponderance of the evidence, that the Plaintiff, Mary Linklater, suffered False Light, Invasion of Privacy by the Defendant, Rufus Lusk?

Yes ___ No  **X**

*If "yes" proceed to question No. 17; if "no" your deliberations are concluded.*

Numerous post-trial motions were filed by all parties. At the first post-trial motions hearing, the trial court concluded that it had made a "fatal error" by admitting the joint financial statement before the jury had made a finding that would entitle Respondent to argue for an award of punitive damages.[5] Ultimately, after the trial court recused itself on its own motion, another member of the Circuit Court granted the Church and Lusk a new trial on the IIED count.

The final Circuit Court rulings of consequence were made by a fourth member of the court, who (1) citing the ministerial exception, granted the Church's motion in limine to exclude all evidence of Respondent's job performance, and (2) thereafter granted renewed motions for summary judgment made by the Church and Lusk. Respondent noted an appeal to the Court of Special Appeals, and filed a brief that did not include argument that the Circuit Court erred in entering judgments on Counts VI, VII, and VIII.

---

5. Md.Code (1973, 2006 Repl.Vol.), Courts and Judicial Proceedings ("CJP") § 10–913(a) provides: Evidence of defendant's financial means.—In any action for punitive damages for personal injury, evidence of the defendant's financial means is not admissible until there has been a finding of liability and that punitive damages are supportable under the facts.

In the "**CONCLUSION**" section of her brief, Respondent requested that the Court of Special Appeals provide the following relief:

1. The ruling ... granting [a] Motion for new trial on Count 5, and the jury verdict in Linklater's favor reinstated.

2. The ruling ... granting Appellees' Motions to dismiss with respect to Counts 4, 9, 10, 12, 13, 14, 15 and 16, and the case remanded for further proceedings against Appellees on those claims;

3. The rulings ... granting ... Summary Judgment [in favor of the Church and Lusk] on Counts 1, 2, and 3, the Synod Appellees' Motion for Summary Judgment on Counts 1, 2, 3, and 5, and ... Summary Judgment [in favor of the Church and the Synod] on Count 11, and the case remanded for trial on the those claims; and

4. In the event the Court does not reverse the grant of a new trial on the IIED claim and reinstate the jury verdict in Linklater's favor, the rulings ... granting the ... Motions *In Limine* excluding evidence related to Linklater's job performance and church governance and granting the ... renewed oral Motion[s] for Summary Judgment, and the IIED claim reinstated and remanded for trial against the ... Appellees.

In an unreported opinion, the Court of Special Appeals held that (1) the IIED claim asserted in Count V "fails, as a matter of law, to meet the high threshold required for liability," (2) that Respondent "alleged at least one instance of retaliatory conduct that fell within the statute of limitations, so her claims [in Counts I and III] are not time-barred, because they are saved by the continuing violation rule," and (3) "[b]ecause Schneider and the Synod are not 'employers' under the Montgomery County Code, ... the hostile work environment and gender discrimination counts [Counts I and III] cannot be brought against them." On the basis of these holdings, the Court of Special Appeals ordered a "remand [of] this case for further proceedings on Counts I, III and IV against Lusk, Counts I, III, IV and XV against the church, and Counts IV

and XIV (Breach of Contract) against Schneider and the Synod." Thus, if we affirm the judgment of the Court of Special Appeals in its entirety, the case at bar will be remanded for further proceedings on the following Counts against the following Petitioners:

## COUNT I

### Sexual Harassment and Hostile Work Environment
### Against Lusk and the Church

\* \* \*

## COUNT III

### Gender Discrimination
### Against Lusk and the Church

\* \* \*

## Count IV

### Retaliatory Harassment and Constructive Discharge
### Against Lusk, the Church, Schneider and the Synod

\* \* \*

## Count XIV

### Breach of Contract
### Against Defendants Schneider and the Synod

\* \* \*

## Count XV

### Breach of Implied Contract
### Against the Church

The brief that Respondent filed in this Court did not include argument that the Court of Special Appeals erred in affirming

the judgments entered by the Circuit Court on Counts VI, VII, VIII, IX, XI, XII, XIII and XVI. She has therefore waived any claim that the judgments entered on those counts should be reversed.[6] In the "**CONCLUSION**" section of her brief, Respondent requests that this Court provide the following relief:

> For the foregoing reasons, the decision of the CSA should be reversed in part and affirmed in part. Specifically, this Court should direct that the jury verdict in favor of [Respondent] on the IIED claim should be reinstated, and her remaining claims which were dismissed based on the ministerial exception should be reinstated and remanded for trial.

Petitioners request that we direct that all of the judgments in their favor be affirmed. We must therefore determine the issue of whether the claims asserted in Counts I, II, III, and IV were timely filed under the "continuing violation doctrine," and the extent to which the ministerial exception is applicable to the claims asserted in Counts I, II, III, IV, V, X, XIV, and XV of Respondent's complaints.

## DISCUSSION

On the date that Respondent filed her Complaint, M.C.C. § 27–19, in pertinent part, provided:

Sec. 27–19.   Unlawful Employment Practices.

(a) It shall be an unlawful employment practice to do any of the following acts because of the race, color, religious creed, ancestry, national origin, age, sex, marital status, handicap, or sexual orientation of any individual or because of any reason that would not have been asserted but for the race, color, religious creed, ancestry, national origin, age

---

6.   "Maryland Rule 5–804(a)(5) requires a party to present 'argument in support of the party's position.'" *Chesek v. Jones*, 406 Md. 446, 456 n. 7, 959 A.2d 795, 801 n. 7 (2008). Failure to comply with this rule constitutes a waiver or abandonment of the issue not argued. *Health Serv. Cost Rev. v. Lutheran Hosp.*, 298 Md. 651, 664, 472 A.2d 55, 61 (1984).

sex, marital status, handicap, or sexual orientation of the individual:

(1) For an employer:

a) to fail or refuse to hire or fail to accept the services of or to discharge any individual or otherwise to discriminate against any individual with respect to compensation, terms, or conditions, or privileges of employment

b) to limit, segregate or classify employees in any way which would deprive or tend to affect adversely any individual's employment opportunities or status as an employee.

\* \* \*

(b) It shall be a violation of this division for any person to cause or coerce or attempt to cause or coerce, directly or indirectly, retaliate against any person because such person has lawfully opposed any act or failure to act that is a violation of this division or has, in good faith, filed a complaint, testified, participated, or assisted in any way in any proceeding or investigation under this division or to prevent any person from complying with this division.

Md.Code (1957, 2003 Repl.Vol.), Art. 49B § 42(a),[7] in pertinent part, provides:

---

7. Before this statute was enacted, Maryland law did not provide a private cause of action for employment discrimination claims. In *Wash. Suburban Sanitary Comm'n v. Phillips*, 413 Md. 606, 994 A.2d 411 (2010), this Court provided the following legislative history:

   § 42(a) had its genesis in a Montgomery County ordinance, namely, Montgomery County Code ("MCC") § 27–20(a), 12 which authorized a private civil cause of action against individuals for employment discrimination occurring within the County. In *McCrory Corp. v. Fowler*, 319 Md. 12, 570 A.2d 834 (1990), we considered whether Montgomery County's enactment of MCC § 27–20(a) exceeded the authority delegated to the County by the *Charter Counties' Express Powers Act. McCrory*, 319 Md. at 13, 570 A.2d at 834.

   We found that Montgomery County lacked the authority under the Express Powers Act to enact MCC § 27–20(a) because the provision of a private civil cause of action against individuals for employment discrimination in the County did not qualify as a "local law." *Id.* at 14, 570 A.2d at 834–35. Specifically, we noted that employment discrimination was "a matter of statewide concern" and that the General Assembly had not granted Montgomery County the power to

In Montgomery County ... a person who is subjected to an act of discrimination prohibited by the county code may bring and maintain a civil action against the person who committed the alleged discriminatory act for damages, injunctive relief, or other civil relief.

On October 16, 2002, Art. 49B, § 42(b) provided:

§ 42(b) Limitations periods(1) An action under subsection (a) of this section shall be commenced in the circuit court for the county in which the alleged discrimination took place not later than two years after the alleged discriminatory act. (emphasis added).

## I. The Ministerial Exception and Sexual Harassment

■■■ The "ministerial exception" is rooted in both the "Free exercise" and "Establishment" clauses of the First Amendment to the United States Constitution.[8] The Free Exercise Clause prohibits governmental action that "encroaches upon the ability of a church to manage its internal affairs." *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 460 (D.C.Cir. 1996) (citing *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116, 73 S.Ct. 143, 154–155, 97 L.Ed. 120 (1952)) (explaining that the free exercise clause protects the power of religious organizations "to

---

enact MCC § 27–20(a). *Id.* at 20, 570 A.2d at 838. In addition, we observed that the creation of new causes of action in the courts has been accomplished traditionally on a statewide basis either by the General Assembly or by the Court of Appeals. *Id.*

In 1992, responding to our holding in *McCrory*, the General Assembly passed House Bill 722, which created the original version of § 42(a), thereby authorizing explicitly private civil actions for violations of the anti-discrimination provisions of the Montgomery County Code. *Id.* at 627–629, 994 A.2d at 423–425 (footnotes omitted).

**8.** The First Amendment, in pertinent part, provides:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]

The First Amendment applies to the states by virtue of the Fourteenth Amendment to the United States Constitution. *Employment Div., Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872, 876–877, 110 S.Ct. 1595, 1599, 108 L.Ed.2d 876 (1990) (citing *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213, (1940)).

decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine"). The Establishment Clause prohibits "excessive entanglement" between government and religion.[9] In *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the United States Supreme Court established the following three part test to determine whether the ministerial exception is applicable to a particular statute:

> First, the statute must have a secular legislative purpose, second its principal or primary effect must be one that neither advances or inhibits religion, finally the statute must not foster an excessive government entanglement with religion.

*Id.* at 612–13, 91 S.Ct. at 2111 (internal citations omitted). M.C.C. § 27–19, like its federal counterpart, Title VII of the Civil Rights Act of 1964 (Title VII) [ (42 U.S.C. § 2000e et seq.) has an obvious secular purpose, and neither advances nor inhibits religion.

Petitioners argue that (in the words of their brief) "the ministerial exception applies not just to matters of religious scriptures or dogma but also more broadly to matters of church governance." Although some federal appellate courts have applied the ministerial exception broadly,[10] we agree with the following analysis by the United States Court of Appeals for the Ninth Circuit:

> Insofar as race, sex, and national origin are concerned, the text of Title VII treats an employment dispute between

---

**9.** The "excessive entanglement" can be substantive when, for example, "a church's freedom to choose its minister's is at stake" *Bollard v. California Province of the Soc'y of Jesus,* 196 F.3d 940, 948–949, or it can be procedural when it results "from a protracted legal proceeding pitting the church and state as adversaries," *Rayburn v. General Conference of Seventh–Day Adventists,* 772 F.2d 1164, 1171 (4th Cir.1985).

**10.** *See e.g., Alicea–Hernandez v. Catholic Bishop of Chicago,* 320 F.3d 698 (7th Cir.2003) ("the 'ministerial exception' applies without regard to the type of claims being brought"); *EEOC v. Roman Catholic Diocese,* 213 F.3d 795, 801 (4th Cir.2000) ("the exception precludes any inquiry whatsoever into the reasons behind a church's ministerial employment decision").

a minister and his or her church like any other employment dispute. The statute does provide two exemptions from its non-discrimination mandate for religious groups. One permits a religious entity to restrict employment "connected with the carrying on ... of its activities" to members of its own faith, 42 U.S.C. § 2000e–1(a); the other permits parochial schools to do the same, *id.* § 2000e–2(e). But neither of these statutory exceptions removes race, sex, or national origin as an impermissible basis of discrimination against employees of religious institutions. Nor do they single out ministerial employees for lesser protections than those enjoyed by other church employees.

*Bollard v. California Province of the Soc'y of Jesus,* 196 F.3d 940, 945 (9th Cir.1999).

In *Sanders v. Casa View Baptist Church,* 134 F.3d 331 (5th Cir.1998), the United States Court of Appeals for the Fifth Circuit stated:

The First Amendment does not categorically insulate religious relationships from judicial scrutiny, for to do so would necessarily extend constitutional protection to the secular components of these relationships ... [T]he constitutional guarantee of religious freedom cannot be construed to protect secular beliefs and behavior, even when they comprise part of an otherwise religious relationship.... To hold otherwise would impermissibly place a religious leader in a preferred position in our society.

*Id.* at 335–36.

*Sanders* was cited with approval by the Supreme Court of New Jersey in *McKelvey v. Pierce,* 173 N.J. 26, 800 A.2d 840 (2002). While reversing the dismissal of sexual harassment claims asserted by a former seminarian, the *McKelvey* Court stated:

Even when [a] dispute arises from activity that occurred in a religious setting, such as a relationship between a church and a ministerial-type plaintiff, to sweep away all of a minister's or seminarian's claims against the church out of fear of encroaching upon the First Amendment not only

neglects, but actually may intrude upon, the two overarching purposes for which the Religion Clauses stand: (1) preventing "sponsorship, financial support, and active involvement of the sovereign in religious activity," *Walz v. Tax Comm'n,* 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697, 701 (1970); and (2) promoting the freedom of an individual "to believe and profess whatever religious doctrine [he or she] desires," *Employment Div. v. Smith,* 494 U.S. 872, 877, 110 S.Ct. 1595, 1599, 108 L.Ed.2d 876, 884 (1990), and of churches "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in N. Am.,* 344 U.S. 94, 116, 73 S.Ct. 143, 154–55, 97 L.Ed. 120, 136 (1952).

\*     \*     \*

Declining to impose neutral and otherwise applicable tort or contract obligations on religious institutions and ministers may actually support the establishment of religion, because to do so effectively creates an exception for, and may thereby help promote, religion. Fenton, supra, 8 Mich. J. Gender & L. at 75; *see also Jones v. Trane,* 153 Misc.2d 822, 591 N.Y.S.2d 927, 932 (N.Y.Sup.Ct.1992) ("[A] contrary holding—that a religious body must be held free from any responsibility for wholly predictable and foreseeable injurious consequences of personnel decisions, although such decisions incorporate no theological or dogmatic tenets—would go beyond First Amendment protection and cloak such bodies with an exclusive immunity greater than that required for the preservation of the principles constitutionally safeguarded."); Shawna Meyer Eikenberry, Note, Thou Shalt Not Sue the Church: Denying Court Access to Ministerial Employees, 74 Ind. L.J. 269, 284 (1998) ("[L]ower courts ... have blindly applied the Lemon test, concentrating exclusively on the third prong, excessive entanglement, without considering the fact that an exemption [from neutral laws] may have the [effect] of advancing religion.... [B]y allowing religious organizations immunity from dis-

crimination suits brought by their clergy, courts give them an advantage that no secular employer enjoys.").

*Id.* at 52–53, 800 A.2d at 856–57.

In *Black v. Snyder,* 471 N.W.2d 715 (Minn.App.1991), an associate pastor of a Lutheran church asserted sexual harassment and related claims against her supervising pastor, alleging that "[the supervising pastor] repeatedly made unwelcome sexual advances toward her including referring to the two of them as "lovers," physically contacting her in a sexual manner, and insisting on her companionship outside the work place, despite her objections." *Id.* at 717–718.

Black's remaining claim for sexual harassment is based on pre-discharge conduct by Snyder and the church. She claims that Snyder's conduct created a hostile work environment, which the church failed to prevent or to remedy, and that these conditions violated the Human Rights Act.

We recognize that sexual discrimination inheres in the pastoral appointments of some churches and has been granted, in effect, a constitutional exemption under both the free exercise and establishment clauses. However, no court has extended a similar protection over sexual harassment claims based on conduct during the employment relationship. Black's sexual harassment claim is unrelated to pastoral qualifications or issues of church doctrine. Because she does not seek reinstatement but only monetary damages, any prospective remedy would not require extensive court oversight.

\* \* \*

... Permitting Black's claim to go forward presents no greater conflict with the church's disciplinary authority than that presented in cases enforcing child abuse laws ... We hold, therefore, that the first amendment does not bar Black from litigating her sexual harassment claim.

We are unpersuaded that enforcing the Human Rights Act's harassment prohibitions would actually burden the church's religious practices, in light of the church's own policy against such conduct. Even if this regulation would

incidentally burden religious activity or belief, Black is entitled to assert this claim because the state's interest in eradicating sexual harassment in the work place is compelling, and we perceive no adequate, less restrictive alternative to enforcement.

471 N.W.2d at 720–721 (internal citations omitted).

■ In the case at bar, the Church has not argued that there is any doctrinal reason for the harassment alleged by Respondent. Moreover, the Church has promulgated the following sexual harassment policy:

**Whereas,** All persons were created by God in the divine image and human sexuality is a gracious gift of God; and

**Whereas,** Our baptism into the family of God calls us to stand firmly and pastorally against all forms fo abuse and to respect and empower our brothers and sisters in Christ; and

**Whereas,** Sexual violence of many kinds is widespread in our society (including sexual harassment on the job, rape and sexual assault, incest, and child sexual abuse), and experts estimate that two-fifths of working women experience sexual harassment, two-fifths of all American women experience one or more incidents of sexual assault, and one-third of American children experience sexual abuse before the age of 18; and

**Whereas,** sexual harassment and sexual abuse betray God's creation, inflict grievous suffering on the harm victims, and rend the fabric of the whole community, of the people of God; therefore be it

**RESOLVED,** that the Evangelical Lutheran Church in America commit itself to work to make our church a safe place for all persons by working to eliminate these abuses; and, be it further

**RESOLVED,** that the Evangelical Lutheran Church in America will not tolerate any forms of sexual abuse or harassment by any of its personnel . . .

■   We agree with the above quoted analysis and therefore hold that the ministerial exception does not operate to bar every claim of sexual harassment asserted against church officials by a former ministerial employee.

### Counts I–III

The opinion of the Court of Special Appeals includes the following analysis:

*Counts I & III–Hostile Work Environment and Gender Discrimination*

The first three counts in Linklater's complaint are based on Lusk's and [the fellow employee's] sexual harassment. Count I contends that defendants created, or condoned the creation of a hostile work environment.

\*     \*     \*

Count III is for gender discrimination based on harassing conduct constituting a difference in Lusk's and [the fellow employee's] treatment of her as compared to their treatment of male members of the church's staff and congregation.

These claims can go forward without running afoul of the ministerial exception because there is no contention that sexual harassment is part of the ministry. In other words, the church is not putting forth any religious justification for Lusk's conduct. In addition, deciding whether the harassment occurred would not involve the court in ecclesiastical matters. The jury would simply have to decide who was more credible in order to resolve a straightforward, "he said, she said" kind of factual dispute.

\*     \*     \*

It is difficult to see how one could come up with a principled basis—except for the severity of harm inflicted—for distinguishing between this suit and a parishioner's suit against a priest who sexually molested him, or the religious organization that continued to employ that priest..... Although the sexual harassment cause of action is considered part of employment law, while actions for molestation would

likely be based on battery, the improper conduct is essentially the same. In either case, the perpetrator engages in inappropriate and non-consensual sexual advances. The court need not delve into ecclesiastical matters to find that this occurred.

*Count II–Quid Pro Quo Sexual Harassment*

\*   \*   \*

Unlike the hostile work environment and gender discrimination claims, adjudicating the quid pro quo claim would require the court to assess whether Linklater was "otherwise qualified to receive" a "job benefit." This would necessitate an evaluation of Linklater's job performance, which would run afoul of the ministerial exception.

■ We agree with the Court of Special Appeals that, "adjudicating the quid pro quo claim would require the court to assess whether Linklater was 'otherwise qualified to receive a job benefit,'" and thus would "necessitate an evaluation of Linklater's job performance which would run afoul of the ministerial exception." We therefore hold that the ministerial exception prohibits Respondent from proceeding to trial on Count II of her Complaint.

■ Although Counts I and III stem from the harassment itself and would not involve the court in "matters of church governance," these counts were dismissed by the Circuit Court on the ground that they were barred by the statute of limitations. The Court of Special Appeals, however, held that because Respondent had "alleged at least one instance of retaliatory conduct that fell within the statute of limitations, [Count I and Count III] are saved by the continuing violation rule." While we agree that the continuing violation doctrine is applicable to Count I and Count III, our conclusion is based upon an incident that is alleged to have occurred within the period of limitations and has nothing whatsoever to do with church governance.

In *Richards v. CH2M Hill, Inc.*, 26 Cal.4th 798, 111 Cal. Rptr.2d 87, 29 P.3d 175 (2001), while holding that an employer

may be held liable for disability related harassment and discrimination actions occurring outside the limitations period,[11] the Supreme Court of California noted that federal cases interpreting Title VII of the Civil Rights Act of 1964 (Title VII) [ (42 U.S.C. § 2000e et seq.) have taken four different approaches to the continuing violation doctrine:

> In the first approach, a continuing violation is found when a corporate policy is initiated before the limitations period but continues in effect within that period to the detriment of the employee.

> \*     \*     \*

> A second approach to the continuing violation doctrine is derived from the doctrine of equitable tolling.

> \*     \*     \*

> A third approach is the multi-factored test first articulated in *Berry v. Board of Sup'rs of L.S. U.* (5th Cir.1983) 715 F.2d 971 *(Berry )*. Under this approach, equitable tolling is one of a number of considerations for determining when a violation is deemed to be continuing. The court formulated the three nonexclusive factors of its test as follows: "The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring (e.g., a biweekly paycheck) or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate? ..." *(Id.* at p. 981.) This third factor is akin to equitable

---

**11.** Although *Richards* involved a claim for disability discrimination, its rationale has also been applied to hostile work environment cases. *See e.g., Birschtein v. New United Motor Manufacturing, Inc.,* 92 Cal.App.4th 994, 112 Cal.Rptr.2d 347 (2001).

tolling, focusing on when the employee was put on notice that his or her rights had been violated.

*   *   *

A fourth approach to the continuing violation doctrine has dispensed with the permanence factor altogether. This approach is exemplified by the Ninth Circuit Court of Appeals, which has adopted what may be termed a "course of conduct" test rather than the *Berry* test, as was recognized in *Counts v. Reno* (D.Hawai'i 1996) 949 F.Supp. 1478, 1484–1486. The test employed is essentially whether the separate acts of discrimination are " 'closely enough related' " to form a continuing violation.

*Richards*, 111 Cal.Rptr.2d 87, 29 P.3d at 183–185. (Emphasis supplied).

The *Richards* Court also noted that "the *Berry* test has been widely adopted by the federal courts." [12] We are persuaded, however, that the "course of conduct" test is most compatible with *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), in which the United States Supreme Court held that Title VII precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period. We also hold that consideration of the entire scope of a hostile

---

12. *See Bullington v. United Air Lines, Inc.* 186 F.3d 1301, 1311, (10th Cir.1999); *Filipovic v. K & R Exp. Systems Inc.*, 176 F.3d 390, 396 (7th Cir.1999); *Sabree v. United Broth. of Carpenters and Joiners*, 921 F.2d 396, 402 (1st Cir.1990); *Hendrix v. City of Yazoo City, Miss.*, 911 F.2d 1102, 1104 (5th Cir.1990); *Roberts v. Gadsden Memorial Hosp.*, 835 F.2d 793 (11th Cir.1988).

The *Richards* Court ultimately adopted a modified version of the Berry test. As in *Berry*, we hold that an employer's persistent failure to reasonably accommodate a disability, or to eliminate a hostile work environment targeting a disabled employee, is a continuing violation if the employer's unlawful actions are (1) sufficiently similar in kind—recognizing, as this case illustrates, that similar kinds of unlawful employer conduct, such as acts of harassment or failures to reasonably accommodate disability, may take a number of different forms (2) have occurred with reasonable frequency; (3) and have not acquired a degree of permanence. *Richards*, 29 P.3d at 186–190 (footnotes and internal citations omitted).

work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as any act contributing to that hostile environment takes place within the statutory time period. The application of equitable doctrines, however, may either limit or toll the time period within which an employee must file a charge.

*Id.* at 105, 122 S.Ct. at 2068.

The Circuit Court and the Court of Special Appeals were both correct in concluding that Respondent may not benefit from the continuing violation doctrine on the basis of conduct that is inadmissible under the ministerial exception. The Court of Special Appeals held that Lusk's February 4, 2001 speech, at the annual report to the congregation, was not barred by the ministerial exception and therefore could serve to "rescue" her otherwise untimely claims. We do not agree with that holding. The ministerial exception is applicable to a speech in which a pastor (1) informs the congregation of a pending lawsuit that could affect the Church, and (2) proclaims that he or she is innocent of misconduct.

■ It is impossible, however, to hypothesize a religious justification for stabbing a photograph of Respondent with multiple holes through the head, eyes, and chest, and then posting that photograph in the hallway across from her office. This is clearly an act of retaliation to which the "course of conduct" test is applicable. Petitioners argue that any act of retaliation that occurred after October 16, 2002 cannot "rescue" the claims asserted in Count I and Count III. In *Birschtein, supra,* the Court of Appeal of California, First Appellate District, rejected a similar argument, stating:

Defendant argued successfully below, and renews the same contentions here, that Bonillia's conduct did not amount to actionable sexual harassment or retaliation for two related reasons. First, the alleged conduct falling within the applicable limitations period was not actionable

because it was not based on plaintiff's gender; that is, was not "harassment . . . based on sex."

\* \* \*

What began as [ ] overt acts of sexual harassment (asking for dates, the "eat you" remarks, his specifically sexual bathing fantasies) were later transmuted by plaintiff's reaction (her complaints to management about the offensive conduct) into an allegedly daily series of retaliatory acts—the prolonged campaign of staring at plaintiff—acts that were directly related to, indeed assertedly grew out of, the antecedent unlawful harassment. The *Accardi* [*v. Superior Court,* 17 Cal.App.4th 341, 21 Cal.Rptr.2d 292 (1993) ] opinion put the matter convincingly when it characterized such a skein of harassment and complaint followed by retaliatory acts as a "continuous manifestation of a sex-based animus."

*Id.* at 351–53. We agree with that analysis, and therefore hold that the continuing violation doctrine is applicable to Respondent's allegations of (1) sexual harassment that occurred more than two years before she filed her Complaint, and (2) retaliatory actions taken against her that occurred within the period of limitations. We therefore affirm the holding of the Court of Special Appeals that Count I and Count III of Respondent's Complaint are not barred by limitations.

### Counts IV, V, X, XIV and XV

■ We hold that the claims asserted in Counts IV, V, X, XIV and XV would necessarily involve judicial inquiry into church governance, and such an inquiry is prohibited by the First Amendment. The uniform line of cases that are consistent with this holding include *Black v. Snyder, supra.* In that case, while holding that the plaintiff was entitled to proceed on her sexual harassment claim, the Minnesota Court of Appeals explained why she was not entitled to proceed on her breach of contract, reprisal, retaliation, and defamation claims:

Black's breach of contract, retaliation, and statutory "whistle blower" claims relate specifically to factors of her

appointment as an associate pastor and discharge. These claims are fundamentally connected to issues of church doctrine and governance and would require court review of the church's motives for discharging Black.

Black's defamation claim is based on the church's stated reason for her discharge as "inability to conduct her ministry efficiently." This claim would require a similar review of the church's reasons for discharging Black, an essentially ecclesiastical concern.

Black's discharge by congregational vote, rather than by the synod itself, does not undermine the doctrinal connection. The congregational vote was conducted according to church procedure established in its constitution. Although deference is traditionally afforded to decisions of a hierarchical church's highest authority, the prohibition against litigating matters at the core of a church's religious practice requires dismissal of Black's discharge-related claims.

471 N.W.2d at 720.

A trial on the merits of the claim asserted in Count IV would necessarily involve an inquiry into the various employment actions taken by the Church, and would therefore "encroach on the ability of a church to manage its internal affairs." *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 460 (D.C.Cir.1996). A trial on the merits of the claim asserted in Count V would necessarily involve an inquiry into various employment actions taken by the Church, as well as an inquiry into matters of church governance. A trial on the merits of the claim asserted in Count X would necessarily involve an inquiry into the Church's employment decisions, and "[t]he [ministerial] exception precludes any inquiry whatsoever into the reasons behind a church's ministerial employment decision." *EEOC v. Roman Catholic Diocese*, 213 F.3d 795, 801 (4th Cir.2000). A trial on the merits of the claims asserted in Counts XIV and XV would necessarily involve an inquiry into matters of church governance and discipline.

## Remaining Issues

Petitioners mount a three prong attack on the M.C.C. First they argue that because "employer" was defined by the M.C.C. as an entity with six or more persons prior to August of 2001,[13] it would be inconsistent to impose individual liability on a "person." Furthermore, the M.C.C. was changed in August 2001 to define "employer" as "anyone who has hired a single individual." Petitioners also argue that the M.C.C. does not apply to them because, at all times relevant to the case at bar, they did not have the requisite number of employees. Finally, they challenge the constitutionality of Article 49B, § 42. None of these arguments were presented to the Circuit Court, so they have not been preserved for appellate review. Petitioners now argue that they are entitled to review of their challenge to the statute on the ground that "the constitutionality of the statute is jurisdictional in nature." It is clear, however, that Petitioners' argument does not involve an issue of "jurisdiction," i.e., the power of the court to hear a case. They now argue that Article 49B, § 42 violates their "constitutional rights" by permitting variation in county laws. In the words of their brief, "[Prince of Peace] with only three employees find themselves subjected to claims and uncapped liability that would not have applied in a vast majority of jurisdictions." They have waived appellate review of this argument by failing to present it to the Circuit Court.

## Conclusion

For the reasons stated above, we affirm the holding of the Court of Special Appeals that Count I and Count III be remanded for further proceedings against Lusk and the Church, and we reverse the holding that the Circuit Court conduct further proceedings on Counts IV, XIV and XV.

---

13. "Person" is defined as "an individual, legal entity, or a department, agency, or instrument of the County or, to the extent allowed by law, of federal, State of local government. A lending institution, including any bank, insurance company, savings and loan association, or other organization regularly engaged in the business of lending money, brokering money, or guaranteeing loans." M.C.C. 27–6.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND VACATED IN PART; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENTS ENTERED BY THE CIRCUIT COURT FOR MONTGOMERY COUNTY ON COUNT I AND COUNT III OF RESPONDENT'S COMPLAINT, AND REMAND TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; JUDGMENT OTHERWISE AFFIRMED; 65% OF THE COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONERS; 35% OF SAID COSTS TO BE PAID BY RESPONDENT.

BELL, C.J., BATTAGLIA and ADKINS, JJ., concur and dissent.

ADKINS, J., concurring and dissenting, in which BELL, C.J., and BATTAGLIA, J., join.

I agree with the majority in large part. I respectfully concur and dissent, however, because I think the majority adopts an unduly broad interpretation of the "ministerial exception" to state laws against employment discrimination. Although the majority allows Counts I and III to survive after application of the ministerial exception, its broad reading of the exception leads to its rejection of Linklater's retaliatory firing claim and other counts of her complaint. The majority views the ministerial exception as barring judicial inquiry into any matter involving "church governance,"[1] and it defines church governance liberally. Applying this broad standard, it concludes that Linklater's other counts would "necessarily involve judicial inquiry into church governance, and such an inquiry is prohibited by the First Amendment." Maj. Op. at 696, 28 A.3d at 1189. I submit that, in doing so, the majority blazes an unduly broad trail for the ministerial exception, and that the retaliatory discharge count and others should survive its application.[2]

---

1. Maj. Op. at 692–93, 696, 28 A.3d at 1187, 1189.

I disagree with the majority's rationale in one other significant respect. In my view, the majority improperly expands the ministerial exception when it holds that the exception protects, and thus bars Linklater's use of, the entirety of Pastor Rufus S. Lusk's February 4, 2001, statements to the congregation.[3]

## I. The Ministerial Exception

### A. Scope

The "ministerial exception" to antidiscrimination laws typically prohibits state inquiry into religious-based employment decisions by churches and other religious organizations. *See Montrose Christian Sch. Corp. v. Walsh,* 363 Md. 565, 593, 770 A.2d 111, 127 (2001) (holding that a church was entitled to employ only members of its faith). Religious-based employment decisions typically involve the hiring and firing of "ministers," which can also include nonclergy.[4]

---

2. In addition to Counts I (Sexual Harassment and Hostile Work Environment) and III (Gender Discrimination), I think Counts II (Quid Pro Quo Sexual Harassment), IV (Retaliatory Harassment and Constructive Discharge), V (Intentional Infliction of Emotional Distress), X (Negligent Retention and Supervision), XIV (Breach of Contract), and XV (Breach of Implied Contract) survive proper application of the ministerial exception. Nevertheless, I agree with the majority that Count V does not survive a motion to dismiss because it fails to meet our standards for claims of intentional infliction of emotional distress generally. I do not address whether the other counts have other, possibly fatal, deficiencies.

3. Although I consider this point significant, it is not outcome-determinative as to any count. The issue arises on appeal because the statements were offered by Linklater as an instance of retaliatory conduct that fell within the period of limitations, thus saving her claims from dismissal on limitations grounds by virtue of the continuing violation doctrine. The majority concludes that other conduct by the pastor suffices to save Linklater's claims from a limitations defense. *See* Maj. Op. at 692–93, 695–96, 28 A.3d at 1189, 1188–89.

4. Respondent Mary Linklater is a "minister" for the sake of the ministerial exception. This Court has indicated that a "music director" falls

This case presents two conflicting values that the ministerial exception must reconcile: churches' ability to make spiritual decisions autonomously and the need for churches to abide by the "profound state interest" in assuring equal employment opportunities for all, regardless of sex. *EEOC v. Roman Catholic Diocese,* 213 F.3d 795, 801 (4th Cir.2000); *see also Rayburn v. General Conference of Seventh–Day Adventists,* 772 F.2d 1164, 1169 (4th Cir.1985).

The cases upon which the majority relies support the general proposition that many of a church's employment decisions are insulated from judicial review. Such insulation exists to prevent excessive government intrusion into religious decision making. The majority cites favorably several federal appellate courts explaining, *e.g.,* that "the constitutional guarantee of religious freedom cannot be construed to protect secular beliefs and behavior, even when they comprise part of an otherwise religious relationship...." Maj. Op. at 687, 28 A.3d at 1184 (citing *Sanders v. Casa View Baptist Church,* 134 F.3d 331, 335–36 (5th Cir.1998)).

But the cases do not categorically prevent all government scrutiny of church employment decisions. Instead, they suggest a more nuanced approach, one that insulates decisions from judicial review only when they are rooted in spiritual matters. The majority recognizes this qualification to a degree, holding that the exception cannot preclude sexual harassment claims. Yet it declines to apply the same qualification when considering the retaliation claim. A quick review of the pertinent cases reveals that the limited contour of the ministerial exception does not warrant its application to Petitioner's retaliation claim.

*Bollard v. The California Province of the Society of Jesus,* 196 F.3d 940 (9th Cir.1999), stands for the principle that

---

under the ministerial exception. *See Archdiocese of Washington v. Moersen,* 399 Md. 637, 663–64, 674–75, 925 A.2d 659, 674, 681 (2007). Here, Linklater was the director of music ministry, a full-time position. She planned the music of the church in a way that enhanced the church's theological message.

courts may not inquire into employment decisions if spiritual matters are the motivation behind those decisions. The *Bollard* court specifically limits its holding to employment decisions made "according to the dictates of faith and conscience." *Id.* at 945. The case also recognizes that sex discrimination is impermissible for a religious organization. *Id.*

As the majority indicates, *Sanders v. Casa View Baptist Church, supra,* instructs that the protection afforded to religious relationships has limitations. Protection from judicial inquiry is given to employment decisions "primarily by preventing the judicial resolution of ecclesiastical disputes turning on matters of 'religious doctrine or practice.'" *Id.* at 336. Thus, *Sanders* makes clear that employment decisions should not be shielded from judicial scrutiny unless they involve spiritual matters, such as religious doctrine or practice. *See id.*

*McKelvey v. Pierce,* 173 N.J. 26, 800 A.2d 840 (2002), and *Black v. Snyder,* 471 N.W.2d 715 (Minn.Ct.App.1991), also cited favorably by the majority, strongly support a limited scope for the ministerial exception. The former case held that to. "sweep away all of a minister's or seminarian's claims against the church out of fear of encroaching upon the First Amendment" would actually run afoul of the Constitution's religion clauses. *McKelvey,* 173 N.J. at 52, 800 A.2d 840. The latter case allowed a sexual harassment claim against a church to proceed because it was "unrelated to pastoral qualifications or issues of church doctrine." *Black,* 471 N.W.2d at 721.

The majority, in disharmonious fashion, both honors and rejects these precedents. To sustain the sexual harassment claim in Count I, the majority relies upon the rationale of these cases, *i.e.,* that religious insulation from the enforcement of antidiscrimination laws must be limited to instances in which the church's conduct is based on theology or doctrine. Yet when it comes to Linklater's retaliatory constructive discharge claim in Count IV, the majority reverses course, relying on *Black v. Snyder, supra,* for the categorical statement that such claims "would necessarily involve judicial

inquiry into church governance, and such an inquiry is prohibited by the First Amendment." Maj. Op. at 696, 28 A.3d at 1189.[5] In *Black*, however, the court denied the retaliatory discharge claim because the church proffered as a reason for the discharge the plaintiff's "inability to conduct the pastoral office efficiently in this congregation in view of local conditions"—and it was the church's proffered reason, not the nature of the claim in general, that would have "require[d] a similar review of . . . an essentially ecclesiastical concern." 471 N.W.2d at 718–720. Although I am skeptical of the distinction drawn in *Black* between the sexual harassment claim (allowed) and the retaliatory discharge claim (disallowed), at least the church in *Black* offered up an arguably doctrinal rationale for her termination.[6]

## B. Application

Here, the Church fired Linklater after she failed to show up for one week. Yet, she asserted that she did so only after the Pastor, in retaliation for her filing charges with the Montgomery County Human Relations Commission and in other formalized channels, refused to give her a job performance evaluation, took unfounded disciplinary actions against her, and conducted a campaign to lower her standing in the eyes of the congregation. The Church, in its argument before this Court, proffers no doctrinal or spiritual basis for these actions.

The majority also relies on *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 460 (D.C.Cir.1996), for the proposition that the Free Exercise Clause prohibits governmental action that "encroach[es] on the ability of a church to manage its internal affairs." Maj. Op. at 685, 28 A.3d at 1183. Notwithstanding

---

**5.** The majority also briskly sweeps away Counts IV, V, X, XIV, and XV. Maj. Op. at 696–98, 28 A.3d at 1189–90.

**6.** Furthermore, *Black v. Snyder*, 471 N.W.2d 715 (Minn.Ct.App.1991), holds that an employment claim against a church is more likely permissible if the plaintiff seeks not reinstatement but only money damages, because adjudication of such a claim "would not require extensive court oversight." *Id.* at 721. Here, Respondent seeks money damages only.

its use of such broad language, that case actually applies a narrow version of the ministerial exception to resolve a case of "pastoral appointment determination." *Id.* at 461, 465.

Furthermore, the majority's selective citation of *EEOC v. Catholic University of America, supra,* does not paint a complete picture. The majority states that the ministerial exception "precludes any inquiry whatsoever into the reasons behind a church's ministerial employment decision." Maj. Op. at 697, 28 A.3d at 1190 (citing *Roman Catholic Diocese,* 213 F.3d at 801). But *Roman Catholic Diocese* also held that "the exception shelters certain employment decisions from the scrutiny of civil authorities so as to preserve the independence of religious institutions in performing their spiritual functions." *Roman Catholic Diocese,* 213 F.3d at 801. Again, the finer language in that case demonstrates that the court engaged in a functional analysis, considering whether the church's decision involved spiritual or doctrinal concerns.

None of the majority's cases delineate a ministerial exception as broad as the one that the majority applies in rejecting Linklater's retaliatory discharge claim. A better approach, based on my study of the cases, is to hold that a court may examine employment claims against a church if they have nothing to do with the spiritual rationale of the ministerial exception. This includes a retaliatory constructive discharge claim if the church does not offer a reason for dismissal related to the "spiritual function" of the church.

Count IV of Respondent's Complaint, accordingly, survives application of the ministerial exception, as the Church does not assert that it had doctrinal or spiritual grounds for its alleged retaliatory actions. It only argues that the ministerial exception "applies not just to matters of religious scriptures or dogma, but also more broadly to matters of church governance." Similarly, the Church offers no doctrinal or spiritual basis for the actions for the actions alleged in Count II (Quid Pro Quo Sexual Harassment), Count V (Intentional Infliction of Emotional Distress), Count X (Negligent Retention and

Supervision), Count XIV (Breach of Contract) and Count XV (Breach of Implied Contract).[7]

If the church had offered a rationale for firing Linklater related to her spiritual functions, that is, her role as the church's music director, then the ministerial exception would certainly bar judicial review of that employment decision. By requiring a church to proffer that the decision was spiritual in nature, the underlying interests of both employment discrimination statutes and the ministerial exception are served. Here, the church does not argue that there was a doctrinal or spiritual basis for its decision to fire Linklater, and the majority does not even address whether religious doctrine or spiritual church operations were considered in her dismissal.

## II. Pastor Lusk's Speech To The Congregation

The question of whether the comments contained in the pastor's speech to the congregation—in which he mentioned the lawsuit, its impact on the congregation, its finances, etc.— has come into play on appeal because Linklater relied on the speech to bring her claim within the applicable period of limitations under the continuing violation doctrine, in response to the Church's defense that her claim was barred by limitations. The majority holds that the speech to the congregation is protected speech *in its entirety*, and therefore inadmissible, but that Linklater's claim is not barred by limitations (on its face) because she alleges other retaliatory actions that occurred with the two-year limitations period. I agree with the majority that Respondent's claims are not barred by limitations, but do not agree that the entire speech is protected under the First Amendment.

The majority holds that the ministerial exception applies to speech in which a pastor (1) informs the congregation of a pending lawsuit that could affect the church, and (2) proclaims that he or she is innocent of misconduct. Maj. Op. at 695–96, 28 A.3d at 1188–89. I submit that this demarcation of the

---

7. There may have been other grounds for dismissal of these counts not presented in this appeal.

protective wing of the ministerial exception is overly inclusive, and that in these statements, the pastor spoke and acted outside the range of the exception.[8] Indeed, the majority does not cite, and I have

---

**8.** The relevant portion of Lusk's remarks follows:

"St. Paul counsels us to speak the truth in love. This has been difficult to do these past nine months since we are in the midst of a legal action by a staff member Mary Linklater that has necessitated the church leadership's maintaining confidentiality. Nevertheless I need in this forum to speak a word about the troubles of this past year. I don't talk about this in worship or teaching, but in council and MMC, and here is a place to address the entire congregation.

"I am the interim pastor. I have no intention of outstaying my usefulness to this congregation. I have been sent here by Bishop Schneider to help you with the transition from one called pastor to another. While I may be the interim pastor I am a real pastor and your presiding pastor. I pray for this congregation, I celebrate your joys and share your agonies. I love this congregation and have done the best I know how to preach and teach and pastor this past year.

"But I am very concerned about the future of this congregation. We face a budget that has either a $60K or $40K deficit depending upon your actions this afternoon. Moreover, as many of you know, Ms. Linklater has filed a complaint with the Montgomery County Human Rights Commission alleging a hostile work environment and other allegations and naming the council, the MMC, the bishop, Neil Howard and myself. This is a public document and you may request a copy. It should be noted that these allegations were only made after the council and MMC expressed displeasure with her performance. More disturbing, a church member, her attorney of record Alice Johnson, has written a letter demanding a $2.5 million settlement for these supposed allegations, hoping that a significant amount of the money would come from me personally.

"One reason I remain your interim pastor is because of the personal request of your bishop, despite the stress these unfounded allegations have caused me and my family. The bishop has complete faith in my ability to see, you through this crisis knowing full well there is no credence to Ms. Linklater's allegations against me.

"As a member of the nominating committee it was my goal, shared absolutely I believe by all members of the committee to find the best six people in our congregation to lead us out of this quagmire. I believe that we have found those six people, and I would urge you to vote for them while also thanking the other five candidates for their concern and love for Prince of Peace. Whoever you elect today I would hope that the congregation would let the new council do its job in a peaceful fashion. Come to the council when you have business before them, but please let them do their job without micro-managing or trying to intimidate them. Moreover, I would hope that the new council would maintain confidentiality.

"Finally the work of pastoring to the many members of the congregation I have come to know well over the past 15 months, the joy of

not found, any cases suggesting that the discussion of such matters is protected.

The majority's rule is especially perilous because it suggests that simply by adding cursory religious content to a statement, a minister gains unlimited freedom to speak with impunity on almost any subject, protected from Title VII and corresponding state claims, as well as from defamation or other tort claims. This rule could allow an unscrupulous minister to use the pulpit to wage a campaign of continued harassment and defamation, cloaked in but unrelated to doctrine or theology.

Lusk was addressing his congregation during the church's annual meeting. Lusk's remarks on Linklater took up approximately half of his entire address to the congregation, and they had a very personal tone. He protested to the entire congregation about Linklater's claim, singling her out by name. Lusk gave assurances that Linklater's allegations had "no credence." He described his own personal and familial stress and called the lawsuit a "crisis," a "quagmire," and a "personal trial."

The content and tone of his speech could reasonably be interpreted as trying to sway congregational opinion against Linklater. Lusk encouraged the congregation to obtain a public-record copy of the Complaint that Linklater filed. He singled out another church member by name for representing Linklater and for "demanding a $2.5 million settlement," calling the settlement negotiation "disturbing." He even insinuated that Linklater's claim itself was retaliatory, in that she did not make her allegations until after the church council "expressed displeasure with her performance."

Lusk made it very clear that his motivation for speaking about Linklater was not spiritual in nature. He specifically said that he was not speaking "in worship or teaching." His

---

welcoming new members into this congregation, and my unfailing commitment, despite this personal trial, to the continuance of this Christian community has deeply enriched my faith."

statement had little to do with church governance or an employment decision. Instead, his remarks could reasonably be perceived as an effort to turn congregational sentiment in his own favor and against Linklater. All of these factors operate to remove his remarks from the shelter of the ministerial exception.

For these reasons, I would reach the same result as the majority on Counts I and III, holding that limitations is no bar to Petitioner's claims. But, I would rely on this speech, in addition to the "photograph stabbing" conduct relied on by the majority, to do so.

Chief Judge BELL and Judge BATTAGLIA authorize me to state that they join in the views expressed in this opinion.